UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

No. 25-1157
_____

_____

UNITED STATES,
Appellee,

v.

AIZAVIER ROACHE,
Defendant-Appellant.

_____

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

BRIEF OF DEFENDANT-APPELLANT
AIZAVIER ROACHE

_____

Christine DeMaso
Assistant Federal Public Defender
Federal Public Defender Office
District of Massachusetts
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
Identification No.: 1168061

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ..................................................................... i

TABLE OF AUTHORITIES.............................................................. iv

JURISDICTIONAL STATEMENT ......................................................1

ISSUE PRESENTED FOR REVIEW ...................................................1

STATEMENT OF THE CASE..............................................................2

    I.    The charged conduct. ................................................................2

       A.    January 19, 2023 Purchase. ..................................................3

       B.    February 2, 2023 Purchase. ..................................................3

       C.    April 25, 2023 Purchase........................................................4

       D.    The resulting indictment.......................................................4

    II.    The 2021 interview and the disputed enhancement.............................5

    III.    Sentencing.......................................................................9

SUMMARY OF ARGUMENT .............................................................12

ARGUMENT..........................................................................................................13

I.   The government did not prove, by a preponderance, that the
     offense involved any guns other than the 6 charged in the
     indictment. The court erred by finding to the contrary and
     applying  a 6-point enhancement based on a summary of Mr.
     Brunson's  uncorroborated, unsworn, unconfronted, and unreliable
     2021  statements. The resulting sentence was procedurally
     unreasonable. ..........................................................................................13

     A.   Standard of review. ...........................................................................13

     B.   Relevant considerations when applying the preponderance
          standard to hearsay statements introduced at sentencing. ...........15

     C.   Mr. Brunson's unsworn, unreliable, and uncorroborated
          statements  were insufficient to prove, by a preponderance, that
          the offense involved any guns other than the 6 charged in the
          indictment. ..........................................................................................18

          i.    Inconsistencies and implausibilities in Mr. Brunson's
                statements. ..........................................................................18

          ii.   The context of the 2021 investigation suggests
                unreliability. ........................................................................21

          iii.  The district court made factual errors in reaching its conclusion
                that the enhancement was supported by a preponderance of the
                evidence. ..............................................................................22

          iv.   Considered in its entirety, the government's summary of
                Mr. Brunson's 2021 statements was insufficient to establish
                the application of the 6-level enhancement by a
                preponderance. ..................................................................26

D.     Mr. Roache's sentence was procedurally unreasonable. This case must be remanded for resentencing with the application of the 2-level §2K2.1(b)(1) enhancement instead of the 6-level enhancement..........................................................................27

CONCLUSION ....................................................................................29

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ................................30

CERTIFICATE OF SERVICE ..............................................................31

# TABLE OF AUTHORITIES

**Page**

## Cases

*Anderson v. City of Bessemer City*,
470 U.S. 564 (1985) ..................................................................14

*Fischer v. United States*,
603 U.S. 480 (2024) ..................................................................20

*United States v. Bryant*,
571 F.3d 147 (1st Cir. 2009) ........................................................24

*United States v. Carrión-Meléndez*,
26 F.4th 508 (1st Cir. 2022) ........................................................17

*United States v. Castillo-Torres*,
8 F.4th 68 (1st Cir. 2021) ............................................................28

*United States v. Colón-Maldonado*,
953 F.3d 1 (1st Cir. 2020) ..................................15, 16, 17, 18, 26

*United States v. Donovan*,
116 F.4th 1 (1st Cir. 2024) ..............................................13, 14, 15

*United States v. Espinoza-Roque*,
26 F.4th 32 (1st Cir. 2022) ..............................................13, 14, 19

*United States v. Forbes*,
181 F.3d 1 (1st Cir. 1999) ............................................................19

*United States v. Green*,
426 F.3d 64 (1st Cir. 2005) ..........................................................17

iv

*United States v. Guía-Sendeme,*
    134 F.4th 611 (1st Cir. 2025) ................................................2, 28

*United States v. Hernández-Negrón,*
    21 F.4th 19 (1st Cir. 2021) ............................................13, 14, 16

*United States v. Jimenez-Martinez,*
    83 F.3d 488 (1st Cir. 1994) ......................................................16

*United States v. Lacouture,*
    835 F.3d 187 (1st Cir. 2016) ..............................................14, 20

*United States v. Lee,*
    892 F.3d 488 (1st Cir. 2018) ....................................................17

*United States v. Mills,*
    710 F.3d 5 (1st Cir. 2013) ........................................................17

*United States v. Montero-Montero,*
    370 F.3d 121 (1st Cir. 2004) ....................................................28

*United States v. Oquendo-Rivera,*
    586 F.3d 63 (1st Cir. 2009) ................................................17, 18

*United States v. Ramos-Paulino,*
    488 F.3d 459 (1st Cir. 2007) ....................................................14

*United States v. Román-Huertas,*
    848 F.3d 72 (1st Cir. 2017) ......................................................28

*United States v. Rondón-García,*
    886 F.3d 14 (1st Cir. 2018) ....................................15, 16, 17, 26

*United States v. Rosa-Borges,*
    101 F.4th 66 (1st Cir. 2024) ............................15, 16, 17, 26, 28

*United States v. Taveras,*
    380 F.3d 532 (1st Cir. 2004) .........................................................................17

*United States v. U.S. Gypsum Co.,*
    333 U.S. 364 (1948) ...............................................................................13, 14

**Federal Statutes**

18 U.S.C. §933.............................................................................................4

18 U.S.C. §1512...........................................................................................20

18 U.S.C. §3231............................................................................................1

18 U.S.C. §3742............................................................................................1

28 U.S.C. §1291............................................................................................1

**US Sentencing Guidelines**

U.S.S.G. §2K2.1(b)(1)..........................................................................15, 27, 29

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231, which grants the district courts exclusive jurisdiction over all federal offenses.

This Court has jurisdiction pursuant to 28 U.S.C. §1291, which confers jurisdiction to review final district court decisions, and 18 U.S.C. §3742, which provides jurisdiction to review a sentence.

The court entered judgment on February 7, 2025. Add. 19.[1] Mr. Roache filed a timely notice of appeal on February 13, 2025. JA 9, 151.

# ISSUE PRESENTED FOR REVIEW

1. Whether the district court erred in concluding that the government proved, by a preponderance, that the offense involved 25-99 guns and imposing a 6-point sentencing enhancement where the only evidence that the offense involved more than the 6 charged guns was summaries of unreliable, unsworn, uncorroborated, and untested statements Mr. Roache's codefendant made two years before the charged offense?

---

[1] Citations are as follows: Add. refers to the addendum; JA to the joint appendix; SA to the sealed appendix; and DE to a district court docket entry.

# STATEMENT OF THE CASE[2]

## I. The charged conduct.

In September 2023, agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) in Boston, Massachusetts had recovered 3 guns that Travon Brunson bought at a sporting-goods store in South Carolina on April 25, 2023. SA 4; JA 55. Each of these firearms was found in the possession of an unlicensed individual, and one was linked to a non-fatal shooting. *Id.* Agents learned that Mr. Brunson bought 4 identical firearms at Academy Sports & Outdoors in Columbia, South Carolina on April 25, 2023. SA 4-5; JA 55. Mr. Brunson represented that he was the actual purchaser of these guns. *Id.* Since 2020, Mr. Brunson had purchased at least 46 guns in South Carolina, including one on February 2, 2023, and one on January 19, 2023. SA 4-5; JA 56-57. Eleven of these guns have been recovered in Massachusetts. *Id.*

Agents suspected that Mr. Brunson was buying guns for Aizavier Roache. They got records for Mr. Roache and Mr. Brunson from Cash App,

---

[2] This Court draws "the facts from undisputed portions of the final presentence report, the sentencing hearing, and the sentencing record." *United States v. Guía-Sendeme*, 134 F.4th 611, 614 (1st Cir. 2025).

Varo Bank, Sutton Bank, T-Mobile, and other companies. SA 5; JA 57. They searched Mr. Roache's cellphone. *Id.* These records included evidence that Mr. Brunson bought guns for Mr. Roache on three occasions. *Id.*

### A.    January 19, 2023 Purchase.

In January 2023, Mr. Brunson and Mr. Roache discussed gun prices by text message before deciding that Mr. Brunson would buy a Glock model 21 for $570. SA 5; JA 57-58. Mr. Brunson bought this gun from Sportsman's Warehouse in Columbia, South Carolina on January 19, 2023. *Id*. When Mr. Brunson told Mr. Roache he bought the gun, Mr. Roache thanked him and asked him to hold it. *Id.* Mr. Brunson sent Mr. Roache a QR code for his Cash App account, and Mr. Roache sent Mr. Brunson $675. *Id.* The Cash App data showed that Mr. Roache was in Boston. *Id.*

### B.    February 2, 2023 Purchase.

In February 2023, Mr. Brunson and Mr. Roache exchanged text messages discussing gun prices and deciding that Mr. Brunson would buy a Glock model 22 for $529. SA 5-6; JA58-60. Mr. Brunson made this purchase at Academy Sports & Outdoors in Columbia, South Carolina on February 2, 2023. *Id.* Mr. Roache sent Mr. Brunson $570 from Boston using Cash App. *Id.* Mr. Roache flew to North Carolina on February 10, 2023, and

told his sister he was in South Carolina on February 11, 2023. *Id.* Mr.

Roache took a bus back to Boston on February 11, 2023. *Id.*

### C.    April 25, 2023 Purchase.

Mr. Roache was in South Carolina and spent time with Mr. Brunson

on April 24 & 25, 2023. SA 6-7; JA 60-61. On the 25th, Mr. Roache gave Mr.

Brunson his credit cart PIN, and Mr. Brunson used this card to buy 4

identical guns at Academy Sports & Outdoors. *Id.* Mr. Roache's phone had

a video from the 25th showing handguns in a compartment, including two

that were consistent with the ones Mr. Brunson bought. *Id.* Three of the

four guns Mr. Brunson bought on the 25th were found in Boston with

people who could not lawfully possess them. *Id.*

### D.    The resulting indictment.

Mr. Brunson and Mr. Roache were charged with conspiring to traffic

in firearms in violation of 18 U.S.C. §§933(a)(1) and (3). JA 11-12. The

indictment, dated January 4, 2024, alleged that this conspiracy began

around January 19, 2023, and lasted through August 30, 2023. *Id.* It charged

that they agreed to ship, transport, or transfer the 6 guns described above

to someone with knowledge or reason to believe it was a felony for that

person to possess a firearm. *Id.*

Mr. Brunson pled guilty pursuant to a plea agreement on October 29, 2024. JA 7-8 (DE 55, 56). He was sentenced to 24 months of imprisonment on March 21, 2025. JA 9 (DE 73, 74). Mr. Roache pled guilty without an agreement on October 30, 2024. JA 8, 40-66. He was sentenced to 57 months of incarceration on February 6, 2025. Add. 1-62; JA 8-9 (DE 65, 66)

## II.    The 2021 interview and the disputed enhancement.

The charged conspiracy occurred in 2023. JA 11-12. The court increased Mr. Roache's offense level by 6 points based on a summary of unreliable, unsubstantiated, unsworn, and uncorroborated interviews Mr. Brunson gave in 2021. Add. 9-25.

In August 2021, ATF agents "assigned in Columbia, South Carolina, interviewed [Mr. Brunson] regarding his suspected involvement in firearms trafficking from South Carolina to Massachusetts." SA 3-4. An agent conducted a follow-up interview by phone. JA 23-24. Mr. Brunson said he bought 24 guns for "Boston," a man he had known through work since 2010. SA 3-4. Mr. Brunson confirmed that this man was Mr. Roache by identifying a photo. *Id.* Mr. Brunson did not know how often Mr. Roache went to Boston, but reported that Mr. Roache "occasionally" said he was going there to visit friends and family. *Id.*

Mr. Brunson said that Mr. Roache would text him a picture of the guns he wanted.[3] *Id.* He said they would meet, and Mr. Roache would give him cash. *Id.* Mr. Brunson would buy the guns representing that he was the actual purchaser. *Id.* He said he would meet with Mr. Roache to give him the guns. *Id.* Mr. Brunson said he assumed that Mr. Roache could not buy the guns himself because he was a felon. *Id.* Mr. Brunson said he made no money from these sales and that he stopped buying guns for Mr. Roache when he learned that Mr. Roache was making money. *Id.* He said he only sold to Mr. Roache. Add. 20. Agents told Mr. Brunson that buying guns for someone is a federal crime and that Mr. Roache was a felon who could not legally possess firearms. SA 3-4. The 2021 investigation did not cause agents to arrest or charge Mr. Brunson or Mr. Roache.

This indictment alleges a conspiracy beginning in January 2023 and does not extend to 2021. JA 11-12. However, at sentencing, a summary of the 2021 interviews meant the difference between a 2-level and a 6-level offense-level increase. SA 3-4, 10; Add. 9-25. The applicable guidelines provide for increased offense levels if the "offense involved three or more

---

[3] During a follow-up interview, Mr. Brunson said he deleted all the messages he described at his first interview. JA 23.

firearms." U.S.S.G. §2K 2.1(b)(1). Two levels are added if the offense involved 3-7 firearms, 4 levels if it involved 8-24 firearms, and 6 levels if it involved 25-99 firearms. *Id.*

The PSR applied the 6-level increase because in addition to the 6 guns charged, "in August 2021, [Mr.] Brunson admitted to purchasing 24 firearms" for Mr. Roache. SA 10. Including this enhancement made Mr. Roache's total offense level 21. SA 10-11; Add. 25-26. Combined with his criminal history category of IV, his guidelines range was 57-71 months. SA 24; Add. 26. Mr. Roache objected, noting that "the uncorroborated statement of a co-conspirator" was the only evidence of uncharged firearms. SA 34. He argued that these statements did not establish by "a preponderance of evidence that the offense for which he has been convicted involved more than the six charged firearms…." SA 34. Probation responded that the enhancement was appropriate because Mr. Brunson said he bought 24 guns for Mr. Roache, ATF records showed that Mr. Brunson had purchased 46 guns since 2020, and "[t]here is no evidence that [Mr.] Brunson was providing any individual other than the defendant with firearms." SA 35.

The government advocated for the 6-level enhancement based on the 6 charged guns and Mr. Brunson's 2021 claim that he bought 24 guns for Mr. Roache.[4] JA 97. It sought a 70-month sentence. JA 115; Add. 27. Mr. Roache argued that a 2-level enhancement, not a 6-level enhancement should apply, making his total offense level 17, his criminal history category IV, and his guidelines range 37-46 months. JA 68-69. He explained that the government had not shown, by a preponderance, that the offense involved any uncharged firearms. *Id.* He argued that Mr. Brunson's 2021 interviews were insufficient to support the application of this enhancement. *Id*. He advocated for a 46-month sentence. JA 67; Add. 33.

---

[4] In Mr. Brunson's plea agreement, the government agreed that the 2-level enhancement for 3-7 firearms applied. DE 55 at 2. In Mr. Brunson's sentencing memorandum, the government said this calculation was wrong. DE 71 at 12-13, n.3. It argued that although it was bound by the plea agreement, a 6-level enhancement applied to both men. *Id.* Mr. Brunson agreed that, absent the plea agreement, a 6-level enhancement was appropriate. DE 72 at 12, 14-15. Despite acknowledging that his sentence should be enhanced based on his 2021 interviews, Mr. Brunson argued that it could not be enhanced based on the other 16 guns he bought between 2020 and 2024 (the indictment charged 6, and he claimed 24 in 2021, but records showed he bought 46 guns). *Id*. at 14-15. He said there was no evidence he trafficked these guns. *Id.*

## III.  Sentencing.

At sentencing the court distilled the issue—the charged conduct supported a 2-level enhancement while a 6-level enhancement depended on the summary of Mr. Brunson's 2021 interviews.[5] Add. 9-17. Defense counsel argued that Mr. Brunson's claim that he bought 24 guns for Mr. Roache was uncorroborated. Add. 16-17. He noted that there were reasons to disbelieve Mr. Brunson—he continued to commit crimes after being warned by ATF and purchased more guns than he admitted to agents. Add. 16-18. Counsel noted that although the government had records establishing the 2023 purchases, they had none corroborating the 2021 statements. Add. 18. The government contended that information on Mr. Roache's phone did not go back to 2021. Add. 20-21. The government argued that the fact that Boston ATF agents went to South Carolina suggested that they already knew that Mr. Roache was involved and took his picture with them.[6] Add. 18-19. The court agreed that it could "presume

---

[5] The court noted that the PSR discussed a possible 7th gun. However, whether the offense involved this gun was irrelevant—adding it to the 6 charged guns still resulted in a 2-level increase. Add. 14-15.

[6] This argument is based on a false premise. Agents did not travel from Boston to interview Mr. Roache. "ATF Special Agents *assigned in* Columbia,

they already had a photo of Mr. Roache with them when they showed up to interview Mr. Brunson." Add. 19. However, agents did not travel from Boston to South Carolina to interview Mr. Roache. *See* SA 3; JA 23. Nor is there reason to believe agents suspected Mr. Roache or had his photograph before Mr. Brunson gave them his name. *See* SA 3-4; JA 23-24.

The court stated that it was not considering probation's argument that there was no evidence that Mr. Brunson sold guns to anyone other than Mr. Roache. Add. 22-23. The court recognized that there was "no affirmative evidence there that supports the application of the inference." Add. 23. It did not draw a negative inference from the lack of text messages "because the phone didn't go back that far in time." *Id.* The court said that "it's a somewhat close determination on a preponderance of the evidence standard" but applied the 6-level enhancement. Add. 23. It explained:

> One, Mr. Brunson, confronted, said it.
> Two, I infer that there's evidence—I infer that the reason that Boston—I'll start at the beginning. I infer there's—some of these guns that Mr. Brunson concededly purchased were ending up in Boston. That's why Boston agents went to South Carolina to interview Mr. Brunson.

South Carolina, interviewed [Mr. Brunson] regarding his suspected involvement in firearms trafficking from South Carolina to Massachusetts." SA 3 (emphasis added); *see also* JA 23. An agent conducted a follow-up interview by phone. JA 23.

The fact that they were ending up in Boston doesn't prove that Mr. Roache was the person who was getting them or having them purchased for him, but it is a small—it is a relevant fact, and it tends to support that.

Second, Mr. Brunson, in his voluntary interview, said that it was Mr. Roache and identified him from a picture, and so forth.

Third, he described the way the purchases occurred. And the way he described the purchases occurring is the way that later, when they could corroborate it, that is when they did corroborate the 2023 purchases, they happened that way.

And so that, under—under the circumstances, I think, is sufficient for a preponderance of the evidence finding.

Add. 23-24; *see also* Add. 12-13 ("I find that that is—Mr. Brunson made those statements to ATF. I think the fact that he described them occurring in a way that later occurred in 2023, he said in '21 it went in a certain way, and in 2023, he said it went in the same way in 2023, at a later time in 2023. And they got forensic evidence that corroborated that, the way it happened.").

The court explained that it was a "close" question:

That said, the reason that I think it is close is that there is—are other facts that, to me, make it close, which is that—and Mr. Brunson said that they all—everything that he purchased went to Mr. Roache. And the ones that make it, you know, close is that he later committed a crime. He committed a crime here, and he later committed another crime, even after he was interviewed by ATF, which causes some concern about Mr. Brunson's statements.

And I'm a little dubious that he didn't make any money from purchasing all of these firearms. I find that not a credible statement. If one firearm, I could see that, but not so many different purchases.

11

And he's talking about it a lot, so that calls into question—that's why I think it's close.

Add. 24-25. Applying this enhancement made Mr. Roache's guidelines range 57-71 months. Add. 26. The government argued for a 70-month sentence. Add. 27-33. Mr. Roache advocated for a 46-month sentence. Add. 33-40. The court sentenced Mr. Roache to 57 months of incarceration and three years of supervised release. Add. 46-50. The court noted that if this Court were to hold that the 6-level enhancement does not apply, it might impose a lower sentence. Add. 47-48, 52-53.

## SUMMARY OF ARGUMENT

The district court erroneously applied a 6-point enhancement based on its conclusion that the government had proved by a preponderance that the offense involved 25-99 guns. Add. 9-25. The application of this enhancement depended on a summary of interviews ATF conducted with Mr. Brunson in 2021. Add. 9-25; SA 3-4, 10. The government did not introduce a written, audio, or video recording of these interviews. Mr. Brunson's statements were unreliable, unsworn, unconfronted, and uncorroborated. Mr. Roache objected that the enhancement should not apply because the government did not prove the facts required to impose it

by a preponderance. SA 34; Add. 16-18; JA 68-69. The summary of Mr. Brunson's unreliable, unsworn, and uncorroborated statements was insufficient, and the district court abused its discretion by finding a preponderance of evidence to support applying the 6-level enhancement. The resulting sentence was procedurally unreasonable. This Court must vacate the sentence and remand for resentencing without the application of the 6-level enhancement.

## ARGUMENT

I. **The government did not prove, by a preponderance, that the offense involved any guns other than the 6 charged in the indictment. The court erred by finding to the contrary and applying a 6-point enhancement based on a summary of Mr. Brunson's uncorroborated, unsworn, unconfronted, and unreliable 2021 statements. The resulting sentence was procedurally unreasonable.**

A. **Standard of review.**

This Court reviews sentences for abuse of discretion. *United States v. Hernández-Negrón*, 21 F.4th 19, 24 (1st Cir. 2021). In conducting this inquiry, it reviews "factual findings for clear error and legal determinations de novo." *United States v. Donovan*, 116 F.4th 1, 10 (1st Cir. 2024). Clear error occurs when this Court is "'left with the definite and firm conviction that a mistake [was] committed' below…." *United States v. Espinoza-Roque*, 26

F.4th 32, 37 (1st Cir. 2022) (quoting *United States v. U.S. Gypsum Co.*, 333

U.S. 364, 395 (1948)); *see also Anderson v. City of Bessemer City*, 470 U.S. 564,

575 (1985) ("Documents or objective evidence may contradict the witness's

story; or the story may itself be so internally inconsistent or implausible on

its face that…the court of appeals may well find clear error even in a

finding purportedly based on a credibility determination."). A court

commits procedural error if it calculates the guidelines improperly.

*Hernández-Negrón*, 21 F.4th at 24-25.

> "'A question [of] whether the evidence is sufficient to support a

particular guideline determination is a question of law, and therefore,

engenders de novo review.'" *Donovan*, 116 F.4th at 10 (quoting *United States*

*v. Ramos-Paulino*, 488 F.3d 459, 463 (1st Cir. 2007)). "The government must

prove that a sentencing enhancement applies to a defendant by a

preponderance of the evidence." *Donovan*, 116 F.4th at 10. "[A] district

court may base its determinations on any evidence that it reasonably finds

to be reliable." *United States v. Lacouture*, 835 F.3d 187, 190 (1st Cir. 2016)

(internal quotations omitted).

> Mr. Roache preserved the argument that the government did not

prove, by a preponderance, that the offense involved any guns other than

the 6 charged in the indictment. He preserved the argument that Mr.

Brunson's statements were unsworn, uncorroborated, and unreliable and

could not support the application of a 6-level enhancement under

§2K2.1(b)(1). He therefore preserved the argument that the court abused its

discretion by applying the 6-level enhancement and imposed a

procedurally unreasonable sentence. Mr. Roache raised these issues in his

response to the PSR, in his sentencing memorandum, and at sentencing. SA

34; JA 68-69; Add. 16-18. De novo review applies to the court's conclusion

that the 2021 statements were sufficient to support a 6-level enhancement.

*See Donovan*, 116 F.4th at 10. To the extent clear-error review applies to

portions of the court's analysis, Mr. Roache can meet that standard as well.

### B. Relevant considerations when applying the preponderance standard to hearsay statements introduced at sentencing.

The court imposed the contested, 6-level enhancement based on the

government's summary of interviews with Mr. Brunson in 2021. A court

can consider hearsay at sentencing, but it must be sufficiently reliable to

support an enhancement. *See United States v. Rosa-Borges*, 101 F.4th 66, 76-80

(1st Cir. 2024); *United States v. Colón-Maldonado*, 953 F.3d 1, 9 (1st Cir. 2020);

*United States v. Rondón-García*, 886 F.3d 14, 23 (1st Cir. 2018). This Court has

"repeatedly cautioned against relying on mere charges to 'infer unlawful behavior unless there is proof by a preponderance of the evidence of the conduct initiating [those] arrests and charges.'" *Colón-Maldonado*, 953 F.3d at 9 (quoting *Rondón-García*, 886 F.3d at 25-26).

"[W]hen a court extends a defendant's sentence based on hearsay, there must be other signs (other 'indicia of trustworthiness') to permit a reasoned conclusion that the statements are still reliable." *Colón-Maldonado*, 953 F.3d at 10; *see also Rosa-Borges*, 101 F.4th at 76-80. The circumstances in which a statement was made matter: "Testimony given in affidavits, depositions, and past trials or hearings usually passes muster because it's based on personal knowledge, sworn under penalty of perjury, and…often sifted through cross-examination." *Colón-Maldonado*, 953 F.3d at 11; *see also Hernández-Negrón*, 21 F.4th at 25 (relying on "prior testimony of both victims, security footage, and the live testimony" of agents to support enhancement); *United States v. Jimenez-Martinez*, 83 F.3d 488, 494 (1st Cir. 1994) (finding court erred in relying on affidavit in part because affiant never testified, no one attested to his veracity, and there was no corroboration). An out-of-court statement may be reliable if it fits "a recognized exception to the hearsay rule." *Colón-Maldonado*, 953 F.3d at 11;

*see also United States v. Carrión-Meléndez*, 26 F.4th 508, 513 (1st Cir. 2022) (finding court abused its discretion in applying enhancement based on "multiple-level hearsay that does not fall into a recognized exception, is made by an unnamed source, is not detailed, and is uncorroborated"). This Court has described "'[u]nsworn verbal allegations'" as "'the least reliable type of hearsay.'" *Colón-Maldonado*, 953 F.3d at 12 (quoting *United States v. Taveras*, 380 F.3d 532, 537 (1st Cir. 2004)).

Courts consider whether a hearsay statement was corroborated or contradicted by other evidence and how detailed the statement was. *See, e.g.*, *Rosa-Borges*, 101 F.4th at 76-80; *Rondón-García*, 886 F.3d at 23; *Carrión-Meléndez*, 26 F.4th at 513; *United States v. Lee*, 892 F.3d 488, 492 (1st Cir. 2018) (finding enhancement appropriate where multiple witnesses made "detailed, internally consistent, and mutually corroborative" statements); *United States v. Mills*, 710 F.3d 5, 16 (1st Cir. 2013) (similar); *United States v. Green*, 426 F.3d 64, 67 (1st Cir. 2005) (similar). Credibility depends on "consistency (both internal to the testimony and with the physical evidence), probability, access of the witness to information, his bias or interest, and corroboration or unexplained contradiction of his testimony

by undisputed testimony or empirical evidence." *United States v. Oquendo-Rivera*, 586 F.3d 63, 67 (1st Cir. 2009).

If such "signs (or others like them) are absent, hearsay alone cannot support" a sentence enhancement. *Colón-Maldonado*, 953 F.3d at 11-13 (collecting cases).

### C. Mr. Brunson's unsworn, unreliable, and uncorroborated statements were insufficient to prove, by a preponderance, that the offense involved any guns other than the 6 charged in the indictment.

The sole evidence that the offense involved firearms other than the 6 charged in the indictment came from a summary of Mr. Brunson's 2021 interviews with ATF agents. *See* SA 3-4, 10; Add. 9-25. His statements were unsworn, uncorroborated, and unreliable. Mr. Brunson did not testify, he was not subject to cross-examination, and the government did not provide a recorded version of his statements. These summaries of Mr. Brunson's interviews do not support the application of the 6-level enhancement.

#### i. *Inconsistencies and implausibilities in Mr. Brunson's statements.*

The court correctly noted indications that Mr. Brunson's statements are unreliable: he continued buying guns for others after being warned by ATF agents; and he told agents that he did not make money from reselling

18

guns. Add. 24-25 The court did not explain why it believed that Mr.

Brunson was credible on other matters. *See United States v. Forbes*, 181 F.3d

1, 7-8 (1st Cir. 1999) (describing finding of witness credibility as

"questionable after the court rejected one aspect of the officer's testimony

and characterized another as 'window-dressing that was added on'").

There are other indications that Mr. Brunson was not truthful in 2021.

Mr. Brunson told agents that he stopped buying guns for Mr. Roache when

he learned that Mr. Roache was making a profit. SA 3-4. Yet in 2023, Mr.

Brunson knew that Mr. Roache was making a profit, and they openly

discussed the profits that each was making. SA 7-8. It is implausible to

believe that in 2021, Mr. Brunson was unaware that Mr. Roache was

making a profit and was upset when he learned that he was.

In 2021, Mr. Brunson told agents that he bought 24 guns for Mr.

Roache. SA 3-4. He said that he only bought firearms for Mr. Roache. Add.

20. He pled guilty to selling 6 guns to Mr. Roache in 2023. JA 7-8 (DE 55,

56). His statement and plea suggest that Mr. Brunson bought 30 guns

between 2020 and 2023. However, records show that Mr. Brunson

purchased 46 guns in this time. SA 5, 35; JA 56-57; *see Espinoza-Roque*, 26

F.4th at 38 ("A sentencing enhancement may not rest on a conclusion belied

by undisputed facts."); *Lacouture*, 835 F.3d at 190 (noting discrepancies between witness statement and police reports). This discrepancy indicates that Mr. Brunson was not truthful and that his statements are not reliable.[7]

Mr. Brunson gave agents incorrect information about Mr. Roache. Mr. Brunson and Mr. Roache worked together in South Carolina beginning in 2010. SA 3-4. Mr. Roache moved to Boston in 2020. SA 21, 23. In 2021, Mr. Brunson incorrectly told agents that Mr. Roache lived in South Carolina and periodically visited friends and family in Boston. SA 3-4; JA 23-24.

Further, Mr. Brunson obstructed justice in 2021. *See* 18 U.S.C. §1512(c). At a follow-up interview, he told agents that he had deleted messages between him and Mr. Roache. JA 23-24. Despite having been interviewed by ATF agents and knowing that they were investigating his gun purchases, he deleted evidence of his conduct. *Id.* This is obstruction. *See* 18 U.S.C. §1512(c); *Fischer v. United States*, 603 U.S. 480, 492, 498 (2024).

---

[7] The court correctly recognized that it is not the defense's burden to prove that Mr. Brunson bought these guns for someone other than Mr. Roache. Add. 22-23. The government would have had to prove, by a preponderance, that Mr. Brunson bought them for Mr. Roache. *Id.* It did not make such a showing for the guns accounted for in the records but not in Mr. Brunson's statement.

Mr. Brunson lied to agents, sought to protect himself whenever possible, committed multiple crimes, and ignored ATF's warning to stop buying guns for other people. His statements are not reliable and do not prove, by a preponderance, that the offense involved more than the 6 guns charged in the indictment.

    *ii. The context of the 2021 investigation suggests unreliability.*

   The context of the 2021 investigation suggests that Mr. Brunson's statements were not reliable. In 2021, ATF began investigating Mr. Brunson for trafficking firearms from South Carolina to Massachusetts.[8] SA 3-4. Despite his reports that he bought 24 guns for a convicted felon, agents did not pursue any charges against Mr. Brunson or Mr. Roache. It is unlikely that agents would ignore this volume of illicit gun sales if they believed they could prove that a crime had been committed. The absence of charges suggests that Mr. Brunson's statements were insufficient and unreliable.

   Similarly, when the government brought this case in 2024, it charged a conspiracy dating back to 2023, not to 2021. JA 11-12. The government was aware of Mr. Brunson's 2021 interviews—they were described in an

---

[8] Mr. Brunson was interviewed by ATF agents in South Carolina; Boston agents did not travel to meet him. *See* SA 3-4; JA 23-24.

affidavit the government submitted in support of detention. JA 23-24. The conduct Mr. Brunson described in 2021 was within the statute of limitations even for a substantive offense. The government's decision not to charge a longer conspiracy between Mr. Brunson and Mr. Roache suggests that Mr. Brunson's statements did not support such charges.[9]

> ### iii. *The district court made factual errors in reaching its conclusion that the enhancement was supported by a preponderance of the evidence.*

The court made factual errors in deciding that the 6-level enhancement was supported by a preponderance of the evidence. First, based on the government's representation that Mr. Roache's phone did not have information on it dating back to 2021, the court drew no negative inference from the lack of messages about the earlier transactions. Add. 21-23. However, a negative inference related to the lack of records of the earlier transactions was appropriate. The government had more evidence at its disposal than Mr. Roache's phone, including bank and phone records for both men. SA 5; JA 57. The government did not represent that these

---

[9] The government apparently placed little emphasis on the 2021 interviews. The 24 guns Mr. Brunson discussed in 2021 were not included in his plea agreement. The government and Mr. Brunson later said they should have been included. DE 71 at 12-13, n.3; DE 72 at 12, 14-15.

records did not go back to 2021. Add. 21-23. Phone records should have shown contacts between Mr. Roache and Mr. Brunson, even if the text messages were not stored on Mr. Roache's phone. Bank accounts should have shown withdrawals, deposits, and electronic payments. The fact that the government had none of this type of evidence suggests that it could not corroborate Mr. Brunson's 2021 statements and that they are not reliable. The court clearly erred by not drawing a negative inference from the lack of records corroborating Mr. Brunson's 2021 statements.

The court incorrectly stated that the way Mr. Brunson described his interactions with Mr. Roache in 2021 was consistent with how the two men interacted in 2023. Add. 24. In 2021, Mr. Brunson said that Mr. Roache sent him pictures of the gun he wanted Mr. Brunson to buy, they met in person, Mr. Roache gave him cash, he bought the gun, and he met Mr. Roache again to give him the gun. SA 3-4. Records from 2023 show a different pattern of interaction. In 2023, Mr. Brunson and Mr. Roache discussed guns and prices together before deciding what Mr. Brunson would buy. SA 4-7. Apart from a video on Mr. Roache's phone of guns consistent with the ones Mr. Brunson had purchased, they did not exchange pictures of firearms. *Id.* Mr. Roache did not give Mr. Brunson cash; he transferred money

electronically. *Id.* In one instance, the two men apparently discussed guns in person, and Mr. Roache gave Mr. Brunson his credit card and PIN so that Mr. Brunson could use them to buy guns. *Id.* Mr. Brunson would hold guns for Mr. Roache, who would travel from Boston to get them. *Id*.

Even assuming, arguendo, that there are some similarities between Mr. Brunson's 2021 description of their relationship and their 2023 interactions, these similarities are not distinctive enough to corroborate the 2021 statement. *See United States v. Bryant*, 571 F.3d 147, 160 (1st Cir. 2009) (describing "distinctive similarities" between drug transactions). A straw purchaser like Mr. Brunson must necessarily communicate with and exchange money and guns with a buyer. Text messaging is a common form of modern communication. Nothing about Mr. Brunson's 2021 description of his alleged interactions with Mr. Roache was unique or idiosyncratic enough to suggest that he must have been telling the truth because the two men continued to interact in that way in 2023. The court clearly erred in relying on the inference that the 2021 statements were corroborated by similarities between the conduct described then and the conduct that occurred in 2023.

Finally, the court erroneously adopted the government's representation that Boston ATF agents traveled to South Carolina in 2021 and wrongfully inferred that the agents had a picture of Mr. Roache with them when they went to interview Mr. Brunson. Add. 23-24. The record is clear. Agents "*assigned in* Columbia, South Carolina, interviewed Travon Brunson regarding *his* suspected involvement in firearms trafficking from South Carolina to Massachusetts." SA 3 (emphasis added). A follow-up interview was done by phone. JA 23-24. No one traveled from Boston, and there is no suggestion that the agents were aware of Mr. Roache or had his photo until Mr. Brunson mentioned him. SA 3-4; JA 23-24. Mr. Brunson had known Mr. Roache for over a decade. *Id.* This is not a situation where Mr. Brunson picked someone out of a lineup or identified a picture of a someone agents suspected. Rather, it seems that Mr. Brunson gave agents the name of the person he said he bought guns for, agents got a picture of Mr. Roache, and Mr. Brunson confirmed that this was the person he was talking about. The court clearly erred in concluding that agents traveled from Boston to interview Mr. Brunson and in inferring that they brought Mr. Roache's picture with them.

*iv.* *Considered in its entirety, the government's summary of Mr.*
*Brunson's 2021 statements was insufficient to establish the*
*application of the 6-level enhancement by a preponderance.*

Even if the court did not commit clear error in assessing the facts, it

nonetheless erred in determining that the government had proved, by a

preponderance, that this offense involved 25-99 guns. Mr. Brunson's

statements lacked any "indicia of trustworthiness." See *Colón-Maldonado*,

953 F.3d at 10. The summary of his interviews was not detailed or

corroborated by other evidence. *See*, *e.g.*, *Rondón-García*, 886 F.3d at 23.

Instead, evidence contradicted his statements. *See supra* Arg.I.C.i. He tried

to protect himself and to minimize his culpability, even destroying

evidence during an investigation. *Id.*; *see also Rosa-Borges*, 101 F.4th at 76-80

(finding hearsay statement insufficient to support enhancement where

statement contained "logical gaps," showed speaker's "concern with

avoiding criminal liability" and was contradicted by other evidence). The

2021 interviews did not result in charges. *See supra* Arg.I.C.ii. The summary

of his "[u]nsworn verbal allegations" is "the least reliable type of hearsay."

*Colón-Maldonado*, 953 F.3d at 12 (internal quotations omitted). Without

signs of reliability, this hearsay "cannot support" the 6-level enhancement.

*Id*. at 11-13.

The application of a 6-level enhancement depended on a summary of Mr. Brunson's unreliable, unsworn, uncorroborated, and untested 2021 statements. The court recognized that this was a close case and that there were indications that Mr. Brunson was unreliable. Add 23-25. The court erred in concluding that the preponderance of the evidence supported the imposition of the 6-level enhancement, resulting in a procedurally unreasonable sentence.

**D. Mr. Roache's sentence was procedurally unreasonable. This case must be remanded for resentencing with the application of the 2-level §2K2.1(b)(1) enhancement instead of the 6-level enhancement.**

The court erroneously imposed a 6-level enhancement under §2K 2.1(b)(1). A 2-level enhancement should have been applied instead. Applying this enhancement, the court calculated Mr. Roache's guidelines range as 57-71 months. Add. 25-26. It sentenced him to 57 months of incarceration. Add. 46-48, 56. Without this enhancement, his properly calculated guidelines range is 37-46 months. JA 68-69. The court stated that if this Court determined that the 6-level enhancement should not apply, it would reconsider its sentence and might impose a lower one. Add. 47-48.

This case should be remanded for resentencing without application of the 6-level enhancement. *See Guía-Sendeme*, 134 F.4th at 624; *Rosa-Borges*, 101 F.4th at 76-77 ("[I]mposing a sentence based on factual findings that are, in turn, 'based solely on unreliable evidence' constitutes reversible error." (quoting *United States v. Castillo-Torres*, 8 F.4th 68, 71 (1st Cir. 2021))). The government should not be afforded an opportunity to present additional evidence. *United States v. Román-Huertas*, 848 F.3d 72, 78 (1st Cir. 2017) ("We have previously allowed additional factfinding where the Government did not have an incentive to present evidence, but not 'where the government asked for the enhancement but failed to adduce sufficient proof for its imposition—a situation in which there would not likely be reason to permit a second bite at the apple.'" (quoting *United States v. Montero-Montero*, 370 F.3d 121, 124 (1st Cir. 2004))).

# CONCLUSION

For the foregoing reasons, Mr. Roache asks this Court to vacate his procedurally-unreasonable sentence and remand for resentencing with instructions that the 6-level enhancement under §2K2.1(b)(1) does not apply.

Respectfully Submitted,

*/s/ Christine DeMaso*

Christine DeMaso
Assistant Federal Public Defender
51 Sleeper St.—5th Floor
Boston, MA 02210
(617) 223-8061
Identification No. 1168061

Dated: June 13, 2025

**CERTIFICATE OF COMPLIANCE WITH RULE 32(A)**

Certificate of Compliance With Type-Volume Limitation, Typeface
Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of Fed. R. App. P.
       32(a)(7)(B) because:

              this brief contains 5,974 words, excluding the parts of the brief
              exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P.
       32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)
       because:

              this brief has been prepared in a proportionally spaced typeface
              using Microsoft Word and 14-point Book Antiqua font.

                              */s/ Christine DeMaso*
                              Christine DeMaso

                              Attorney for Aizavier Roache

                              Dated: June 13, 2025

**CERTIFICATE OF SERVICE**

I, Christine DeMaso, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, including all counsel of record, specifically, Donald Campbell Lockhart, as identified on the Notice of Electronic Filing on June 13, 2025.

*/s/ Christine DeMaso*
Christine DeMaso

# ADDENDUM

# TABLE OF CONTENTS

Sentencing Transcript (2/6/25) ...................................................................Add. 1

Judgment ...........................................................................................Add. 55

i

1          UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2

3    _____

4    UNITED STATES OF AMERICA,

5         Plaintiff,                      Criminal Action No.
                                          1:24-cr-10001-LTS-1
6         v.

7    AIZAVIER ROACHE,

8         Defendants.

9    _____

10

11      BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12

                        SENTENCING
13

14

15              Thursday, February 6, 2025
                       11:01 p.m.
16

17

18

19

20

21   John J. Moakley United States Courthouse
     Courtroom No. 13
     One Courthouse Way
22   Boston, Massachusetts

23

     Rachel M. Lopez, CRR
24   Official Court Reporter
     raeufp@gmail.com

25

**Add. 1**

1                          **A P P E A R A N C E S**

2

3    On behalf of the Plaintiff:

4        UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
         BY:  LUKE A. GOLDWORM
         John Joseph Moakley Courthouse
5        One Courthouse Way, Suite 9200
         Boston, Massachusetts  02210
6        (617) 748-3621
         luke.goldworm@usdoj.gov

7

8    On behalf of the Defendant:

9
         FEDERAL PUBLIC DEFENDER OFFICE
10       BY:  JOSHUA HANYE
         51 Sleeper Street
11       Fifth Floor
         Boston, Massachusetts  02210
12       (617) 223-8080
         joshua_hanye@fd.org

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2              (In open court.)

3              THE DEPUTY CLERK:  The United States District Court

4    for the District of Massachusetts is now in session, the

5    Honorable Leo T. Sorokin presiding.

6              THE COURT:  Please be seated.

7              THE DEPUTY CLERK:  Today is Thursday, February 6,

8    2025, and we are on the record in criminal case number

9    24-cr-10001, the United States versus Aizavier Roache.

10             Will counsel please state your name for the record.

11             MR. GOLDWORM:  Good morning, Your Honor, Luke

12   Goldworm for the United States.

13             THE COURT:  Good morning.

14             MR. HANYE:  Good morning, Your Honor, Josh Hanye

15   for Mr. Roache.

16             THE COURT:  Good morning.

17             Good morning, Mr. Roache.

18             MR. ROACHE:  Good morning.

19             THE COURT:  Okay.  So we're here for Mr. Roache's

20   sentencing.  I have the presentence report, revised

21   February 3rd, the defendant's sentencing memorandum,

22   exhibits, and the government's sentencing memorandum and

23   exhibits.

24             That's everything, right?

25             MR. GOLDWORM:  Yes, Your Honor.

1          MR. HANYE:  Yes, Your Honor.

2          THE COURT:  Okay.  I thought what I'd do is run

3     through the guideline calculations, as they do address the

4     various objections.

5          Yes, do you have something else?

6          MR. HANYE:  Your Honor, I do have a procedural

7     objection to one of the government's arguments that I want to

8     raise first.

9          THE COURT:  Sure.

10         MR. HANYE:  So the government's arguing for an

11    additional four-point enhancement, under 2K2.1, I think it's

12    (b)(6)(B), in connection with another felony offense.  The

13    procedural objection is that there was no objection lodged

14    based on this, so that violates Rule 32.  It violates the

15    rules, the Court's procedural sentence at the sentencing

16    order.

17         And in this particular case, we, Mr. Goldworm and

18    I, actually discussed what the government's position was

19    going to be on the guidelines.  And I will say that there was

20    a lot of back and forth and cooperation and collaboration

21    with probation in producing what became the initial

22    presentence report, but the government indicated to me that

23    they were not going to pursue that guidelines objection that

24    they now are pursuing.

25         And ultimately, the sentencing memo was filed just

**Add. 4**

1    two days before sentencing, and so that particular

2    combination, I think, did fairly raise the issue for

3    Mr. Roache.  And so I would ask the Court to not even

4    entertain it for those reasons, because it's been waived

5    under those particular facts.

6              THE COURT:  Anything you want to say?

7              MR. GOLDWORM:  Your Honor, I will fall on the sword

8    on this one, I think, as appropriate.  Between the initial

9    PSR, where --

10             THE COURT:  The draft PSR?

11             MR. GOLDWORM:  The draft PSR, yes, Your Honor, and

12   the final PSR, I had submitted to probation a supplemental

13   statement of offense conduct to try to include these

14   additional points for consideration.  When those points --

15   when probation, essentially, said it doesn't persuade them

16   one way or the other to move the needle, at that point the

17   government did -- made no additional efforts here.

18             And as Mr. -- or Attorney Hanye and I were going

19   back and forth, and at one point I had said, as he rightly

20   says, I'm not going to jump up and down about these

21   additional four points.  And the more I put together the

22   sentencing memo, despite the fact that the government's

23   recommendation is still in the original guidelines, it's not

24   based on the additional four points, it's still within the

25   guidelines as set out by probation, I did reference, because

1    I do think that there is evidence to support that it is the

2    right additional four points.

3          I understand the procedural error.  And to that

4    discrepancy, Your Honor --

5          THE COURT:  So let me say this.  First, kudos to

6    Mr. Goldworm for being honest about it, and just, like, it is

7    what it is.  And you're not sitting here -- some lawyers

8    might tell me, "Well, actually, Judge, I'm entitled to do

9    it," even though you're not, whatever, and some -- so kudos

10   to you for to that.  It's always a pleasure when people are

11   just forthright and confront the issues, and I appreciate

12   that.

13         Second, I will say two things.  I think it is late.

14   I think you're ordinarily supposed to make objections in

15   response to the draft PSR.  I assume they didn't include it

16   in the draft PSR.  I don't see the draft, so I don't know.  I

17   assume not.  So I think that's the time to do it.

18         I think that the circumstances that Mr. Hanye

19   raises, that sometimes that people make it after the final.

20   You get it a week or two before the sentencing, it's like,

21   okay, it should have been earlier, but we should decide

22   things on the merits, and what's the difference.  It is

23   tougher when it's two days before.  That said --

24         So, one, it's kind of moot, because I did it

25   consider on the merits.  I'm not persuaded.  And so there

**Add. 6**

1  isn't going to be a four-point enhancement.

2        And I think the facts that you presented -- your

3  objection is to the -- his -- to me ruling on the merits, I

4  understand, of applying the four-point enhancement, not to

5  the information that he provides, most of which was in the

6  PSR, anyway.  And so I don't know whether I need to exclude

7  it on the merits, procedurally or not.  Because I will say,

8  one of the things that I was going to get to, I was going to

9  note that I thought it was late.  But in any event, I did

10  think about it, and I have not -- I'm persuaded by

11  probation's position on the four-point enhancement, in any

12  event.

13        Is that sufficient to resolve your procedural

14  objection, or do you want a more express ruling?

15        MR. HANYE:  Because I don't know what's going to

16  happen, and there's no plea agreement here, so there could

17  potentially be an appeal, I would request the Court make a

18  ruling on the procedural objection, on the argument that it's

19  been waived for the argument that I made already.

20        THE COURT:  I need to look at the rule to see

21  whether -- which part of Rule 32.1?

22        MR. HANYE:  Rule 32(f)(1), I think.

23        THE COURT:  Okay.  So I read the 14-day -- it's the

24  14 days, put in late under the 14 days.  Mr. Goldworm doesn't

25  contend otherwise.  I view that within that rule is an

**Add. 7**

1  implied -- you could get an extension -- well, obviously, you
2  could get an extension, if you asked for it in advance.  But
3  also, good cause could support this even after the fact.  And
4  I would think that there is a prejudice component, too,
5  depending on what it is, and how harmful it is.
6          Here Mr. Goldworm has been very candid and doesn't
7  advance any good cause as to why it is late.  So I think it
8  is late.  So therefore, I think it's procedurally -- so I
9  rule it out for two reasons.  One, I sustain the objection on
10  process.  I had -- though I had noted it, it was late, when
11  in my preparation of the sentencing, I didn't go back and
12  reread 32(f).  So I considered it on the merits.  And when we
13  get to it, I'll explain to you that -- I can just say now.  I
14  can skip it then.
15          I read the objection.  I read all the materials.
16  And I thought that probation's decision that the government
17  hadn't proved it by preponderance of the evidence was -- on
18  the different theories that you advanced, was correct.  And
19  so without the -- either there's two reasons for the
20  four-point enhancement not applying.  One is the process.
21  And even if I'm wrong about the process, I think probation is
22  correct on the merits, and I did consider that.  So -- okay.
23          Anything else before I just run through the
24  guidelines?
25          MR. HANYE:  No.  Thank you.

1          MR. GOLDWORM:  No, Your Honor.

2          THE COURT:  Okay.  So then I'm -- just for the

3    record, since now we've been talking about process, so my

4    understanding is that, in this case, like all cases --

5          By the way, you reviewed the presentence report

6    with your client, right, Mr. Hanye?

7          MR. HANYE:  Yes, Your Honor.

8          THE COURT:  That there was a draft report released

9    to all of you.  I don't see the draft report.

10         Then there was the January 30th presentence report,

11   final presentence report, that was released to me and to all

12   of you.

13         And then there was an addendum or revised

14   presentence report on February 3rd.  That's the one I'm

15   referring to.  It has very slight changes, which are noted

16   in -- on page 37.  So -- so that's the presentence report to

17   which I'm referring.

18         So the offense level was calculated this way.  And

19   I'll stop at each point.  Base offense level of 14 because of

20   the nature of the charge, and he, Mr. Roache, was a

21   prohibited person.

22         So then probation assessed a six-point enhancement,

23   under 2K2.1(b)(1)(A) for the offense involving 25 firearms,

24   but less -- more than 25, but less than 99.  And Mr. Hanye,

25   on behalf of Mr. Roache, objects to that.

**Add. 9**

1          So this is how I see that.  There are, concededly,

2     six firearms which Mr. Roache admitted to in the plea.  Those

3     are, I think, the one firearm from January 19, 2023, one

4     firearm from February 2nd, 2023, four firearms from April 25,

5     2023.

6          There are four more firearms that are not in the

7     indictment, but are described in the presentence report, and

8     there are, with detail, corroborating information about the

9     purchase by Mr. Brunson and the acquisition of those firearms

10     for Mr. Roache.

11          And so I take your objection to be a two-part

12     objection, Mr. Hanye.  Your first objection is it should just

13     be six firearms, which would be a two-point enhancement under

14     this guideline, instead of the six-point enhancement

15     probation applied.  That objection is overruled for the

16     following reason:

17          I think in the presentence report, the four

18     firearms from September 23rd are more than sufficiently

19     established by preponderance of the evidence and aren't

20     susceptible to, really, to the factual arguments that you

21     make, which are that either the -- arguably inconsistent, as

22     you put it, explanations by probation or some implied attack

23     on Mr. Brunson's credibility.  So that would mean -- so it's

24     at least a four-point enhancement, because that would be

25     eight guns.  And you conceded that if those four count, then

eight, and that would be four points.

So the first part of your objection is overruled for the reasons that I've expressed and the reasons expressed in the presentence report that probation says six points.

Then to get from the four-point enhancement to the six-point enhancement requires consideration of the firearms that Mr. Brunson described in his 2021 interview with ATF, that he purchased and that he said that --

I think it was 24 firearms?

MR. GOLDWORM:  Uh-huh.

THE COURT:  That he said that he purchased and that he sold to Mr. Roache.

So there are two parts, just to be complete, I think, to your objection, Mr. Hanye.  One part is that then those guns, those purchases are the kind of thing that can't count at relevant conduct.  Or I take it that that's part of your argument, within the meaning of the guidelines.

I overrule that.  I think that those purchases can count, assuming that by preponderance they're proven. They're the kinds of things that could count in the assessment of the firearms.

The second part of your objection, essentially, is the government hasn't produced enough evidence to connect Mr. Brunson's purchase of those 24 to Mr. Roache, such that they can be counted under the guideline.

1    I have one question before I resolve that, of you,

2 Mr. Goldworm.  Mr. Goldworm, in your memo, at -- I think it's

3 at page 2, you describe a little bit more detail about

4 what -- let me step back.

5    The presentence report says Mr. Brunson purchased

6 24 firearms in 2021.  ATF agents went to him in a voluntary,

7 consensual interview.  And in that interview, he

8 attributed -- he said he bought those guns, and he said he

9 sold them, bought them for and gave them to Mr. Roache.

10    In your memo, at page 2, you describe a couple of

11 additional facts, specifically that in -- that Brunson

12 explained that Mr. Roache would text him photos of the

13 firearms that he wanted, and they would then meet, and that's

14 when they would make the cash exchange.  And they met at

15 different locations.

16    And I'm wondering, are those statements that

17 Brunson made in 2021?

18    MR. GOLDWORM:  Yes, Your Honor.

19    THE COURT:  Okay.  That's what I thought, but I

20 wanted to confirm that.

21    So given that, I overrule the second part of your

22 objection, Mr. Hanye, because I find that that is --

23 Mr. Brunson made those statements to ATF.  I think the fact

24 that he described them occurring in a way that later occurred

25 in 2023, he said in '21 it went in a certain way, and in

**Add. 12**

1    2023, he said it went in the same way in 2023, at a later

2    time in 2023.  And they got forensic evidence that

3    corroborated that, the way it happened.

4            I think that's sufficient for a preponderance of

5    the evidence on the record before me.  And so I sustain --

6    I'm sorry, I overrule the objection.  And for that reason, I

7    apply the six-point enhancement of at least 24 or 25 -- more

8    than 25 firearms.

9            MR. HANYE:  So may I respond?

10           THE COURT:  Of course.

11           MR. HANYE:  The response I have is about what the

12   Court noted about firearm purchases in September of 2023 --

13           THE COURT:  Yeah.

14           MR. HANYE:  -- which I read the presentence report

15   as saying, in September 2023 is when the ATF became aware of

16   purchases from earlier in 2023.  So I'm looking at

17   paragraph 11.

18           I admit, I'm not seeing evidence of additional

19   transfers to Mr. Roache in September of 2023, just that

20   that's when they became aware of the --

21           THE COURT:  You're saying that the four firearms

22   that -- there's the six in the indictment.

23           MR. HANYE:  Yes.

24           THE COURT:  And then I identify, first, four more

25   from September 2023.  And you're saying --

1          MR. HANYE:  Those are in the indictment.

2          THE COURT:  Those are the four that are in the

3    indictment.

4          MR. HANYE:  From April of 2023.  Correct.

5          THE COURT:  Is that your view, Mr. Goldworm?

6          MR. GOLDWORM:  One second.

7          Yes, Your Honor, those are some of the firearms.

8          THE COURT:  Putting aside the 2021 firearms -- put

9    them aside for the moment -- is your view that there's, in

10   2023, in the presentence report, there's obviously the one

11   firearm from January 19, 2023, and one firearm from

12   February 2nd, 2023, and four more from April 25th?

13         MR. GOLDWORM:  One of the -- so, Your Honor, one of

14   the firearms referenced here -- so there's -- there's

15   purchases in January 29th, 2023, but one of the guns

16   mentioned in paragraph 12 is purchased on January 19, 2023.

17   So that was one not connected to the purchases that were

18   charged, at the very least.  The rest I agree with Mr. -- or

19   Attorney Hanye, that the April ones, and certainly, I think,

20   the February ones, were connected.

21         THE COURT:  I see.  So the paragraphs 11, 12, and

22   13, you think, are referring to the six that are in the

23   indictment, plus one more?

24         MR. GOLDWORM:  Yes, Your Honor.

25         THE COURT:  Okay.  Then I stand -- I reconsider

**Add. 14**

 1    what I said and reverse myself.  I misread that.  My
 2    apologies.  And so then -- one second.
 3              MR. HANYE:  But even -- I see evidence of six
 4    firearms in 2023.  I don't see evidence of seven.
 5              THE COURT:  I don't think it matters.
 6              MR. HANYE:  Okay.
 7              THE COURT:  Because if the -- it's a two-point
 8    enhancement for three to seven firearms.
 9              MR. HANYE:  Right.
10              THE COURT:  And so whether it's the six -- everyone
11    agrees it's the six.  The seventh one that Mr. Goldworm
12    identifies doesn't change the guideline range.  So, at least
13    at the moment, it doesn't matter.
14              You both agree with that?
15              MR. GOLDWORM:  Yes.
16              MR. HANYE:  I agree that there's no difference
17    between six and seven for the purpose of the guidelines, yes.
18              THE COURT:  You agree that, like, there isn't
19    another one in 2023?
20              MR. GOLDWORM:  Not that I'm aware of, Your Honor.
21              THE COURT:  Okay.  So your request I reconsider.  I
22    allow.  I reconsider.  I was wrong.  There's only six or
23    seven in 2023.  Either way, that's just a two-point
24    enhancement.  Then there's 2021, which --
25              Is there something that you want to say about that,

**Add. 15**

1  or no?

2          MR. HANYE:  Yes.  Is that the statement by the

3  co-defendant about providing 24 guns, prior to 2023, to

4  Mr. Roache?

5          THE COURT:  Yes.

6          MR. HANYE:  I think that's the core of the

7  government's evidence.  I do want to address that.

8          THE COURT:  Yes.  So this is paragraph 9.  As I

9  understand it, on August 5, 2021, right, the agents met with

10  Mr. Brunson, and he then told them that he purchased 24

11  firearms for somebody who he identified in the course -- they

12  identified as your client.  And the -- and what Mr. Goldworm

13  has confirmed -- you probably have seen the 302, I assume, of

14  that interview -- but that, at that time, he said that your

15  client would text photos.  In the interview he said that your

16  client had texted him photos of the firearms.  And so it's

17  that 24 that puts him over to the six.

18          MR. HANYE:  So I just want to address that the

19  24 -- and make my objection clear --

20          THE COURT:  Yes.

21          MR. HANYE:  -- to that, which is that statement

22  from the co-defendant is uncorroborated.  And because it's

23  uncorroborated, it's insufficient to meet the preponderance

24  of the evidence that the government bears.  And there's no

25  evidence of where that number came from.  Did Mr. Brunson

**Add. 16**

1  just make that number up?  Was he presented with this number

2  24 and he adopted it?  We have no idea.

3          It's not -- there's corroboration that Mr. Brunson

4  was purchasing firearms, because the agents got those forms.

5  But that's not corroboration that any other firearms, besides

6  the six that Mr. Roache pled to, actually went to Mr. Roache.

7  The fact that the co-defendant said that, that by itself is

8  just completely insufficient.

9          There's reasons to actually believe that that

10  statement wasn't reliable.  Because Mr. Brunson, after

11  talking to the ATF, then went and committed additional crimes

12  after that, that eventually got him charged.  So that's one

13  reason that Mr. Brunson is not liable.

14          The lack of any information about where that number

15  came from is another indication.  The fact that that number

16  is different than the number of firearms that he also

17  purchased, which was 46, which is also referenced in the PSR,

18  is another reason that that statement is insufficiently

19  reliable.

20          So there's just nothing else that corroborates that

21  statement.  That's the argument why --

22          THE COURT:  So you're saying, one, it's not

23  reliable -- it's not -- there is no other information that

24  verifies the assertion that 24 firearms went to your client.

25          MR. HANYE:  Exactly.

**Add. 17**

1          THE COURT:  That he bought more than 24, so he

2     was -- that would -- you say, suggest, that he's selling to

3     other people.  And he was -- he then committed further crimes

4     after that, the 2023 purchases.  And so those three things,

5     you say, make him unreliable.

6          MR. HANYE:  Exactly.  To meet the preponderance

7     standard.

8          THE COURT:  Right.

9          And there's no other -- the only other relevant

10    fact in your view is the fact that he then said it was your

11    client -- and I understand by your arguments, but that's in

12    the universe of facts; and that what he said about -- that

13    your client would text him photos.

14         MR. HANYE:  He said that, right.

15         THE COURT:  Yeah.

16         MR. HANYE:  But law enforcement got Mr. Roache's

17    phone in November of 2023.  If there was evidence of those

18    prior purchases, prior to 2023, prior to the charged ones, we

19    would know about that.  The fact that we don't have that

20    evidence suggests that there's an absence there, which is

21    another reason to question why, you know, the -- the

22    assertion that the government meets its burden here.

23         THE COURT:  What do you say?

24         MR. GOLDWORM:  Well, first, Your Honor, I point to

25    the fact that the ATF didn't go to Mr. Brunson in a vacuum,

**Add. 18**

in a magic vault.  The Boston, New England ATF, went to

Mr. Brunson in South Carolina, because the guns were coming

up here to Massachusetts to be used.  They didn't magic a

photo, produce a photo of Mr. Roache to show to Mr. Brunson

because Mr. Roache wasn't already on their calculation as the

person up here receiving the guns.  They had -- they

recovered them --

THE COURT:  So it seems a fair inference, if it was

Boston ATF agents, what you're saying is it's a fair

inference that these firearms were showing up -- at least

some firearms were showing up here.

But how do I know how many?  And how do I know --

and what, I understand -- I'm confident the agents wouldn't

fly to South Carolina for no purpose or for no reason.  They

would have had a reason.  And I presume they already had a

photo of Mr. Roache with them when they showed up to

interview Mr. Brunson.

But without more, their hunch, suspicion, what have

you, that ordinarily wouldn't be preponderance evidence,

without specifics.  I guess what --

MR. GOLDWORM:  Your Honor pointed to several

specific details of that conversation, which link to the

current conduct, identically so.  And I would take the

different -- a different view than Attorney Hanye, which is,

if they had 46 guns, the number 24 indicates that those were

1    the guns that he gave to Roache.  He could have said all 46.

2    He could have said -- to cover himself, he could have

3    picked --

4            THE COURT:  Did they know about 46 then?

5            MR. GOLDWORM:  I believe --

6            THE COURT:  Or 46 minus the ones in --

7            MR. GOLDWORM:  It might have been 46 minus -- I

8    stand corrected, Your Honor.

9            MR. HANYE:  We don't know.  I think unanswered

10   question ultimately mean that the burden hasn't been met.

11           MR. GOLDWORM:  I would continue, Your Honor, both

12   in 302s and in the detention memo filed by the Court, there's

13   a statement from Mr. Brunson in this interview that says, "I

14   only sold them to Mr. Roache.  I only sold guns to

15   Mr. Roache."

16           THE COURT:  Mr. Brunson said that when?

17           MR. GOLDWORM:  In the 2021 interview.

18           THE COURT:  I see.  So he said, in the 2021

19   interview, "I only sold to Mr. Roache.  He texted me photos.

20   He paid me cash.  We met in different places."  And the

21   corroboration that you say that comes from that, things that

22   corroborate it is, one, the reason that Boston agents went

23   there is because they were finding at least some guns that

24   trace back to South Carolina, to Mr. Brunson, up here; two,

25   they went down -- and, two, the later purchases went the same

way as those earlier purchases.  Mr. Brunson said that

earlier, not later.

                    And -- and the forensic analysis of the phone, is

there -- were there -- did the text -- it was text messages.

Is that the way they communicated?

                    MR. GOLDWORM:  Yes.

                    THE COURT:  Were the text messages recovered back

to 2021?

                    MR. GOLDWORM:  My memory is we did not have them

very far back in that -- including there was additional

comment that we would have liked to have proved, separate and

apart from 2021, that we were hoping would be in the text

messages, that was decidedly absent because the phone had

only fairly fresh content on it.

                    THE COURT:  I see.  So it didn't have -- so that

is, it didn't have 2021 content, showing texts between them

to arrange these purchases.

                    MR. GOLDWORM:  Yes.

                    THE COURT:  And it didn't have 2021 content that

didn't show it.

                    MR. GOLDWORM:  Correct.

                    THE COURT:  Anything else you want to say?

                    MR. HANYE:  If there's an inference that there's a

suspicion directed towards Mr. Roache when they go and

interview Mr. Brunson, because of the Boston connection, then

1 there's also an inference that Mr. Brunson would have been

2 motivated to limit the admission of his legal conduct to one

3 person and that he was motivated to not necessarily be

4 entirely truthful, to be what he thought he could be

5 partially truthful and reduce the consequences. And the fact

6 that he continued to do this afterwards, just supports that

7 inference.

8    Again, it all comes back to the statement, and the

9 fact that Mr. Brunson said, "I only gave them to Mr. Roache.

10 That, itself, is also insufficiently reliable for those

11 reasons.

12    One last thing that I would add, that I didn't

13 address before, is just I need to respond to probation's

14 response to the objection, which included the argument that

15 there's no evidence that guns from Mr. Brunson went to

16 anybody else. That is just an incorrect application of the

17 burden here. That would shift the burden to Mr. Roache to

18 produce that. So I just want to make sure that that's not

19 part of the Court's analysis.

20    THE COURT: No, it's not. The determination that I

21 make is we have a universe of factual evidence that's before

22 me. Is that universe of factual evidence sufficient on a

23 preponderance to sustain the government's burden to seek the

24 enhancement? Here we're talking about from two to six -- two

25 to six points. Whether it's six guns or seven guns, I think,

in my view, doesn't matter in 2023 in terms of the guideline

calculation, because either, if 24 comes in, it's above at

six or seven.  And if it's not 24, it doesn't get there.

That isn't reliable.  So I decide that based on the universe.

And just to be clear, because the phone didn't go

back that far in time, I don't draw the inference that the

absence of inculpatory evidence means that undermines

Mr. Brunson's statement the way it would if the text

exchanges went back to 2020.

On the other hand, it doesn't prove -- there is no

affirmative evidence there that supports the application of

the inference.

Give me one second, because now you framed it, and

I'm tracking it a little more clearly than I had thought

about it before.

Okay.  I'm going to overrule -- I concede, it's a

somewhat close determination on a preponderance of the

evidence standard, but I'm overruling the objection

because -- for a couple of reasons.

One, Mr. Brunson, confronted, said it.

Two, I infer that there's evidence -- I infer that

the reason that Boston -- I'll start at the beginning.  I

infer there's -- some of these guns that Mr. Brunson

concededly purchased were ending up in Boston.  That's why

Boston agents went to South Carolina to interview

1  Mr. Brunson.

2          The fact that they were ending up in Boston doesn't

3  prove that Mr. Roache was the person who was getting them or

4  having them purchased for him, but it is a small -- it is a

5  relevant fact, and it tends to support that.

6          Second, Mr. Brunson, in his voluntary interview,

7  said that it was Mr. Roache and identified him from a

8  picture, and so forth.

9          Third, he described the way the purchases occurred.

10  And the way he described the purchases occurring is the way

11  that later, when they could corroborate it, that is when they

12  did corroborate the 2023 purchases, they happened that way.

13          And so that, under -- under the circumstances, I

14  think, is sufficient for a preponderance of the evidence

15  finding.

16          That said, the reason that I think it is close is

17  that there is -- are other facts that, to me, make it close,

18  which is that -- and Mr. Brunson said that they all --

19  everything that he purchased went to Mr. Roache.  And the

20  ones that make it, you know, close is that he later committed

21  a crime.  He committed a crime here, and he later committed

22  another crime, even after he was interviewed by ATF, which

23  causes some concern about Mr. Brunson's statements.

24          And I'm a little dubious that he didn't make any

25  money from purchasing all of these firearms.  I find that not

**Add. 24**

1    a credible statement.  If one firearm, I could see that, but
2    not so many different purchases.  And he's talking about it a
3    lot, so that calls into question -- that's why I think it's
4    close.
5           And so your rights are preserved as to the
6    objection.
7           So that, when it's all said and done -- I'll start
8    at the beginning, just to make it clear for the record.  So
9    it's a 14 base offense level.  Everyone agrees with that.
10   It's a two-point enhancement for six or seven guns.
11   Everybody agrees that's appropriate.  The dispute is whether
12   there should be an additional four points.  The only basis
13   for the additional four points is Mr. Brunson's statement to
14   ATF in 2021.
15          For the reasons that I just articulated, I'm
16   applying that extra four points, the 25 to 99 firearms,
17   affirming probation's view, overruling the objection --
18          The rights are preserved, Mr. Hanye.
19          That leads to a six-point enhancement under
20   2K2.1(b)(1)(A).
21          And then there's a four-point --
22          There's no enhancement for obliterated serial
23   numbers.  I agree with probation on that.  I don't think
24   there is any -- if there is an objection --
25          MR. GOLDWORM:  No objection.

**Add. 25**

```
 1              THE COURT:  All right.
 2              There's a four-point enhancement for trafficking in
 3     firearms, 2K2.1(b)(5).  I think that applies whether we're
 4     talking about six firearms or the larger number.
 5              I don't understand you to be objecting to that,
 6     right, Mr. Hanye?
 7              MR. HANYE:  Correct.
 8              THE COURT:  Right.
 9              And then 2K2.1(b)(6)(B), I've already ruled on.
10     There's no enhancement applied by probation.  I agree with
11     them.  And I agree for the two reasons that I stated earlier.
12     That results in a final offense level, as set forth in the
13     PSR, of 21.
14              Saving your objection, but putting aside that,
15     given what I ruled, do you agree it's a 21?
16              MR. HANYE:  Yes.
17              THE COURT:  And then no dispute by anybody, this is
18     a Criminal History Category IV.
19              MR. HANYE:  Correct.
20              MR. GOLDWORM:  No, Your Honor.
21              THE COURT:  Okay.  And so that leads to a guideline
22     sentencing range of 57 to 71 months, one to three years of
23     supervised release, a 15 --
24              You're not asking for a fine, are you?
25              MR. GOLDWORM:  No, Your Honor.
```

**Add. 26**

1      THE COURT:  Well, it's a range of 15,000 to 150, if

2   he can afford to pay a fine.

3      Restitution -- there's no restitution that applies

4   here.

5      The mandatory special assessment of $100.

6      I'll hear from you, Mr. Goldworm.

7      And then from Mr. Hanye, and Mr. Roache, if he

8   wishes.

9      MR. GOLDWORM:  Your Honor, in this case, the

10  government is asking for 70 months of incarceration, followed

11  by three years of supervised release.  And the government's

12  argument is based on the ultimate menace to public safety

13  caused by the number of illegal guns being in circulation,

14  the totality of the circumstances, that complete narrative of

15  looking at this as more than just a transaction of firearms,

16  but the ultimate impact of those firearms in the community,

17  Your Honor.

18      The defendant, by putting that -- even the six guns

19  into the community, eroded the fabric of those communities by

20  putting people at risk and endangering people that are just

21  trying to go about their day, working an honest day for

22  honest pay, to go to school, and so forth, by injecting a

23  level of violence, by putting guns -- he, himself, is a

24  prohibited individual, but he's putting guns in other

25  people's hands.

**Add. 27**

1    And as Your Honor has noted prior, a firearm really

2  has a singular purpose, which is destruction, either serious

3  bodily injury or death.  And so the defendant, by his very

4  business, was a merchant of violence in this way.

5    And the -- the government touched on, when we were

6  talking about the enhancements, those two-dozen-plus guns

7  that enter from South Carolina to Massachusetts, the fact

8  that the ATF here in New England was seeing enough of a

9  pattern of these guns popping up that they went to South

10 Carolina to speak to Mr. Brunson, went to his door, says a

11 lot.

12   I think what says more is that the pair continued

13 this conspiracy of trafficking firearms after, essentially,

14 been given a hall pass or some sort of divine intervention

15 from the ATF saying, "Knock it off.  We know what you're

16 doing."  They said, "Mr. Roache is a felon.  He can't possess

17 a firearm.  Stop giving him guns."  And I think common sense

18 would imply that, if they're in this conspiracy together or

19 they're committing this, that Mr. Roache was aware that the

20 federal government was looking at them at some point in time.

21   Now, can I say that dispositively?  Of course not,

22 Your Honor.  But I think common sense would suggest that.

23   And yet, those guns continued into the hands of

24 people that would use them for violence.  And starting -- and

25 looking at attachment C to the government's memorandum,

1  Your Honor, you can look that within 15 days of one of these

2  guns being purchased, one of the guns in the indictment being

3  purchased, it's used.  It goes from South Carolina, up here.

4  It is used at a shooting outside the Dublin House in

5  Dorchester, in which two people were seriously injured and

6  went to the hospital, wounded, with injuries to their chest,

7  ankle, hip, and arms.

8          Forty-one days later, that gun is grabbed from --

9  by law enforcement in Boston off of a gang member.  It had an

10  extended magazine in it.  And that's a sampling that you can

11  see, Your Honor, from the attachments A, C, D, E and F of the

12  government's memorandum, in which firearms that start in

13  South Carolina, seemed to find their way into Massachusetts,

14  in hands, at crime screens.  Those include shootings, shots

15  fired, blastic damage, and so on.

16          And if you look at the fact that those are only

17  guns that law enforcement has been able to recover at scenes,

18  and then go back and link to incidents, any crime that's out

19  there, any of these firearms that are out there that haven't

20  been recovered, we don't know the impact at this point.  The

21  evidence submitted to the Court is based just on what we're

22  aware of at this moment in time.  And given the volume over

23  the years, it is terrifying what the potential damage could

24  be.

25          And Your Honor, as we look at here, the scope and

**Add. 29**

1 the breadth of what is potentially possible in terms of the

2 defendant's conduct, that collateral damage, is concerning.

3 But beyond that, then the defendant had made plans with the

4 co-conspirator to obliterate the serial numbers, quote, Make

5 them unrecognizable, because he didn't want those guns coming

6 back to him because he knew the choices he was making.

7      If those guns come back to him, one, he's

8 prohibited.  He shouldn't even have a firearm.  But if they

9 do come back to him, those guns, which would be used for

10 crime, threats of violence, carrying out of violence, will

11 come back to him.

12      And the people buying guns from Mr. Roache are not

13 going to gun stores.  There's a reason that they're buying

14 guns from Mr. Roache.  There's a reason that he wanted to

15 obliterate those numbers.

16      And the defendant himself has used a firearm, as in

17 32(a) in the PSR discusses, to threaten someone.  In his own

18 words, he talks about threatening someone with a firearm.

19      And more than that, we see, both in the PSR and in

20 attachment A of the government's memorandum, that he's

21 diversifying his enterprises; that there is evidence that he

22 is also involved in the drug trade.  Your Honor, he's --

23 there's quotes about him, "I'm out here selling crack."

24      There's -- he's in an incarcerative facility,

25 pending this case, and he's involved with drugs.  And I note,

1    in that particular instance, Your Honor, an inference could

2    be made, as he and the other detainee were disciplined

3    together, Mr. Roache admitted the possession of the drugs in

4    that incarcerative facilitate in Wyatt were his.  And when

5    both detainees were tested, Mr. Roache was clean for drugs,

6    but that other individual was -- had tested positive for the

7    drugs.  I think an inference could be made that the drugs in

8    the incarcerative facility were there for Mr. Roache to deal

9    them, hence why he didn't have any in his system, and the

10   other individual did.

11           THE COURT:  I found the other disciplinary report

12   more concerning.

13           MR. GOLDWORM:  I was going to get to that one,

14   Your Honor.

15           THE COURT:  All right.

16           MR. GOLDWORM:  And that speaks to the -- the place

17   we are now.  Because that incident, Your Honor, involves

18   Mr. Roache and another -- a number of other detainees

19   committing assault on someone else in the facility.  And

20   despite the fact that that individual, they targeted this

21   individual because -- without a shred of proof or any sort of

22   evidence, they decided that he may -- and I'll emphasize

23   "may" -- have cooperated in some court of law enforcement.

24   And in their code, in their law of the street, that was a

25   problem.  In the defendant's own words, that individual was a

1  Decepticon; he was a gangster gone bad.  And as a result,
2  they subjected him to a gang assault.
3         I think it's hard to look at the defendant's
4  conduct in this case as some sort of trite mistake or misstep
5  and more a life that he has chosen repeatedly, again and
6  again, starting from property and larceny crimes, when he was
7  a teenager, and progressing we're now in federal court on a
8  federal firearms trafficking charges.  And you would think
9  that this would be a moment for reflection and a time to
10 amend your life.  But he's in custody on this case, and he's
11 committed two disciplinary actions while in custody on this
12 case.  I find that deeply concerning.
13        The records -- his court interactions in three
14 states wasn't enough to dissuade him, certainly with him
15 being held in custody on something that has, potentially,
16 significant impact on his -- his life going forward would
17 have slowed him or demurred in some way from his conduct.
18 But it seems that the law that he respects is not the law of
19 the land but the law of the street.  And I think that's
20 evidenced in the action in Wyatt, where he -- he and the
21 other detainees came to their own decision about what to do
22 in that situation.
23        And so in -- to sum it up, Your Honor, I think all
24 of the 3553(a) factors lead to the -- a place where the
25 defendant's conduct has consistently and historically been

1   one that has endangered the public, has made this --

2   Massachusetts and the communities here less safe.  And he has

3   decided that the twin ills of drugs and guns are an

4   enterprise, a business of misery that he is -- he has carried

5   out, and seemingly without any sort of thought of the

6   implications or concern for that conduct, as he's doing the

7   same two things now in Wyatt.

8           So Your Honor, I think the government struggles

9   to -- here to find the appropriate sentence, but ultimately

10  believing that, in this case, having -- beginning with the

11  ATF's notification in 2021, that this -- this conspiracy of

12  firearms trafficking was problematic, and leading to the

13  charges here before the Court today, and all the collateral,

14  sort of, behavior of the defendant, the appropriate sentence,

15  it's a tough but fair sentence, and the government would ask

16  you to impose 70 months of incarceration and 36 months of

17  supervised release.

18          THE COURT:  Okay.  Thank you, Mr. Goldworm.

19          Mr. Hanye?

20          MR. HANYE:  Thank you, Your Honor.

21          Your Honor, we're maintaining our recommendation of

22  46 months of incarceration.

23          In light of the Court's findings as to the

24  guidelines, I would ask the Court to consider not more than

25  57 months, which is the low end of the guidelines that the

Court has found.  I certainly believe that 46 months meets
the statutory test of what's sufficient, but no greater than
necessary.  But I would alternatively argue that there is
nothing that should draw the Court above 57 months.  And
there's several reasons for that.

The starting point is -- for me, is that either
46 months or 57 months is a significant increase over any
prior sentence that Mr. Roache has previously received.  His
longest prior sentence was a year.  So we're talking about an
increase of either four times or five times, approximately,
his prior period of incarceration.

Such a big increase goes right to several of the
statutory sentencing factors.  It goes to deterrence.  It
goes to just punishment.  It goes to promoting respect for
the law.  Because when we're talking about that big of an
increase, it sends a message to Mr. Roache for all of those
reasons.  Those are -- those are the sending-the-message
factors, and either four times as much as he's previously
done, or five times as much as he's previously done
sufficiently accomplishes those.

There's -- I want to mention something that I
didn't mention in the sentencing memo, that goes directly to
how long Mr. Roache will be incarcerated on any number that
the Court gives, which is that he's got warrants in South
Carolina, which means that he's going to be ineligible for

any time at a halfway house.  So that is typically a
six-month period, where someone is out of the BOP and in the
community.  He's not going to be eligible for that.  So once
he's finished with whatever sentence the Court imposes here,
I expect he's going to have to go back to South Carolina.
Even if he's not extradited, he would be ordered to go there
on his own.  Either way, he's not going to get a halfway
house.

And I don't expect there would be a way for him to
resolve those cases while he's in custody.  So it's a
consequence that he created for himself, but it's one that is
appropriate and affects how much actual time he's going to do
in prison.

The other factors that I would point to, and which
I addressed in the sentencing memo, Your Honor, are his
background, and also the family support that he has now, that
goes -- his family background really cuts both ways, in that
it was a -- a great absence for him, great challenges, based
on his father's addiction and incarceration.  But he also
does have support on his mother's side of the family.  I
mean, what he's trying to do, what his family is trying to
help him do is to interrupt the cycle of negative
consequences that flow directly from a parental
incarceration.

His father died of fentanyl overdose.  He spent

much of Mr. Roache's time as a child incarcerated.  Even when
he was out, he wasn't particularly involved in Mr. Roache's
life.  And even when he was, he was a negative influence.

The presentence report, which includes information
from his mother, the letters of support that have been
submitted to the Court, all talk about how this pushed
Mr. Roache, at a very young, impressionable age, towards the
street, towards other negative influences.

None of that is an excuse, but it is something that
he is very concerned about, that he may be doing the same
thing to his child; that he's looking for a way to be able to
become present in his father's -- in his son's life, the way
his father wasn't in his.  And if he gets six years, as the
government asks for, that's much harder than if he were to
get four or five years.  And I think that's a factor that
should go to the Court's consideration of what's enough here.

In spite of that absence, of that harm that he
suffered, of the path that it put them on, which has resulted
in negative consequences for himself, he does have better
opportunities for the future.  He does have the opportunity
to have a much more positive relationship with his
stepfather, who has a very strong relationship with his
mother, who is employed as a truck driver, who wants to help
Mr. Roache find a career.

Mr. Roache, one thing about him is that he's a

worker, which, unfortunately, shows that he didn't have to do the behavior here. But he has opportunities for the future, and I think being a truck driver is something that he's interested in, something that he's got some access to. And his stepfather is more than willing to try to help him make that a reality.

I also want to point out that two of the people who wrote letters of support for him are here in court today, his aunts, Vela Keaton and Lisa Delahunt.

THE COURT: Welcome.

MR. HANYE: We've had that same discussion about the hard work that Mr. Roache actually has to do to make a difference in the future.

So we understand, and he understands, that there was harm here. That was the basis of why, in our original recommendation, we actually recommended the high end of what I still think the correct guidelines should be.

THE COURT: Uh-huh.

MR. HANYE: But as the guidelines go up, it doesn't necessarily mean the sentence has to go up. Because all of those factors get accomplished by all of that time in prison.

And ultimately, 46 months, with the supervised release, is sufficient. But, again, I don't think anything longer than 57 months would meet the standard here, Your Honor.

**Add. 37**

```
1            THE COURT:  Thank you, Mr. Hanye.

2            Mr. Roache.

3            MR. ROACHE:  Yes, sir.

4            THE COURT:  You have the right, if you wish, to

5    speak on your own behalf, say whatever you wish to say to me,

6    before I determine what sentence to impose.  You don't have

7    to speak, and if you want to remain silent, I won't hold it

8    against you.  But if you want to, now is the time to do so.

9            MR. ROACHE:  Yes, I will.

10           THE COURT:  Go ahead.

11           MR. ROACHE:  Your Honor, I would like to start off

12   by saying thank you for letting me accept responsibility and

13   speak on my piece and to come forward and accept

14   responsibility.  I would like to say that I'm disgusted in my

15   actions that I caused, and I didn't know that I was being a

16   part of an operation that was endangering the community.  All

17   I seen was the money side of this.  I didn't know -- I didn't

18   think about the harm I caused.  And in my heart, an apology

19   goes out to anybody -- that goes out to anyone that fell

20   victim to gun violence.

21           I would also like to apologize to my mother, who

22   did the best she could to raise me, and I let her down

23   because she never raised me like this at all.

24           I would also like to apologize to my son, who is

25   two years old of age, and it sucks that I can't be there for
```

**Add. 38**

him, to care for him, to nurture him.  And I'm just missing so much time out of his life, and I only did it for a couple of dollars.  And at the end of the day, none of it was even worth it.

Growing up, I surround myself with the wrong crowd of people.  I was easily influenced due to not having no male figure around.  My father died from a fentanyl overdose, and growing up, the only moments I had of him is just glorifying the streets and negative acts.  This was the start of a new life for me, because I looked up to him for all of the wrong reasons.

I have a son now and a different outlook of life. I want to be able to provide him with the best life ever, but most importantly, protect him from any situation and actions that may influence him to go down the same path that I went.

It sucks that I can't be there for him, and it's actually killing me.  I can't be around for his wellbeing. But as a man, I have to accept full responsibility for this. I found out I have to want better and try better for the sake of my life.

All my life, I was trying to find out who would accept me or what crowd would accept me.  And the main thing that I found out is the only person that I'm in competition with each and every day is myself.  And I need to strive for success, and everything else will fall in place for me.

1    My plans for the future is to work on myself.  My

2    stepfather wants me to work for his truck driving company and

3    help me get my CDL, so I can become a certified truck driver;

4    be a better role model for my son; and be able to put all of

5    this behind me, so I can move forward in life.

6    So once again, I would like to say, from the bottom

7    of my heart, I apologize to anyone who fell -- I apologize to

8    anyone who fell victim to any gun violence.  I apologize to

9    the state of Massachusetts, and to my family I let down with

10    my actions.

11    Thank you so much for letting me speak my piece,

12    Your Honor, and thank you for your time and consideration.

13    THE COURT:  Thank you, Mr. Roache.

14    So let me tell you a couple things, first,

15    Mr. Roache, before I deal with the sentence.  You have to

16    decide -- whatever I do here today, okay, you just have to

17    decide what kind of life you want to live.  All right?  And

18    that's really for you to decide -- not for me to decide, not

19    for Mr. Goldworm, not for Mr. Hanye.  You just have to decide

20    who you want to be and who you are.  All right?

21    It's your actions that largely define who you are.

22    Right?  So you -- right now, what your behavior has been

23    telling me is that -- I'll get to what you said, which I like

24    some of the things that you said, and I commend you for that.

25    But your behavior for what you're doing, it's telling me that

you want to go to prison.  Okay?  You're selling firearms.
You get into prison -- and I see a lot of cases.  I'm not
sure -- I see a lot of -- I sentence a lot of people.
Sometimes I see that their disciplinary reports for people in
there -- when they're at Wyatt or the other places that
people are detained.  But very rarely do I see a disciplinary
report where someone participated in an assault on a person
because they thought he was an informant.  Okay?  And that's
what the disciplinary report in the record and the
description of the body cam video shows me.  And so that's
a -- you know, those are things that you're -- those are
choices that you're making each day about how you want to
behave and who you want to be.

    Your mother wrote a beautiful letter, really, a
very unusual letter.  And your aunts wrote lovely letters,
too, but your mother's letter stands out.  I've read a lot of
letters.  Okay.  And it stands out.  I believe you when you
say that this isn't the way she raised you.  And she has
great hope for you to live differently.  And so the reason
that I say this to you, is you have to decide who you want to
be and how you want to behave.  And that decision, that's not
coming at the end of your prison sentence.  That starts every
day.  Each day, you have to decide who you want to be.

    So when you go back to Wyatt today and tomorrow and
the next day, and then when you go on to the Bureau of

1  Prisons, you can decide that, you know, you want to spend
2  your time in jail with people who are harming other people.
3  You can decide to be one of those people in custody who wants
4  to find out, let me see your PSR, let me see your sentencing
5  judgment, let me see your transcript, let me see if you
6  cooperated, let me participate in beatings, or anything else,
7  of someone who you think might have been an informant.  You
8  can do that.  It's not right, it's not lawful, but there are
9  people who do that, I'm sure.  All right.  That's one choice
10  about who you want to be.
11          I know if you asked your mother who does she want
12  you to be, or if I asked your aunts do they want you to do
13  that, they would all tell me no, they don't want that.  But
14  the decision -- you're a grown-up, and the decision is yours.
15          But you could also choose to spend your time
16  differently, both in prison, and then when you get out of
17  prison.  You could choose to spend your time living right.
18  You could spend your time in prison educating yourself,
19  participating in whatever programming that they have that you
20  can participate in.  You could read books -- you could -- for
21  example, you said something that when you were selling the
22  firearm, you were only thinking about the money, right?
23          MR. ROACHE:  (Nods head.)
24          THE COURT:  And you weren't thinking about the
25  people who were getting shot.

**Add. 42**

1          MR. ROACHE:  No, sir.

2          THE COURT:  And the people who were getting maimed

3    or the people who might die.  Right?  And you weren't

4    thinking about their mothers, right?

5          MR. ROACHE:  (Nods head.)

6          THE COURT:  And I bet -- you've been shot, right?

7          MR. ROACHE:  Yeah.

8          THE COURT:  And so I was thinking what did your

9    mother think the day you were shot, when she got the phone

10   call from somebody that said you're in the hospital, and

11   you've been shot?  I'm sure that she loves you the more --

12   more than the world itself, and that she was terrified and

13   she felt awful and she was scared, and she was worried about

14   what would happen to you.  And, fortunately, you look like

15   you're pretty healthy now, so that's good.

16         But those people who got shot by those guns you

17   sell -- sold, they have mothers, too, and they have aunts and

18   they have brothers and they have sisters and they might have

19   children.  And all those people feel the same way when their

20   loved one was shot as yours.  So you have to decide, do you

21   want to be that person who helps cause that harm, or do you

22   want to be that person who doesn't?  Okay?

23         So when you're in prison, you could read -- you've

24   talk about this realization that you've come to.  You could

25   read books about restorative justice or the harm that comes

**Add. 43**

1    from the kind of behavior and the kind of things you did.

2    And to -- because you've opened your eyes a little bit, you

3    say, and you could open your eyes more.  Okay?  And if you

4    don't know what to read, you could ask probation or

5    Mr. Hanye, and Mr. Hanye can ask probation.  I'm sure he

6    knows, but if he doesn't, he could ask probation, and they

7    could give you things to look at.

8          So the choice you have is every day, use your time

9    to make the world a better place as best you can, even in

10    prison, and make yourself a little better and live right, or

11    the choice to go the other way.  That's the choice you have.

12    You have that choice, whatever I do here today.

13          And that is a really important choice, because I

14    think, given your family and given your background and given

15    your ability to work, you could -- you could live right.  You

16    could live well.  You could do right.  You could get out,

17    whatever sentence I impose, and you could be there for your

18    son.

19          Because, you are right, that the thing that your

20    son cares the most about is your presence.  And you -- you

21    can't control right now your presence in the next period of

22    time, but you can control what happens to you by how you

23    behave in prison, and then later you can control what happens

24    to you by how you behave.

25          You know where that door goes, right?  The door to

**Add. 44**

1 the marshals lockup.  And you have the keys to that door,

2 ordinarily.  You've given me the keys now, but when you're

3 done with your prison sentence, you hold those keys.  And

4 then if you live your life the way I bet your mom lives her

5 life -- she has those keys to that door, too.  And do you

6 know where she keeps them?  In her pocket.  She doesn't give

7 them to Mr. Goldworm, and she doesn't give them to me.  And

8 that's smart.  But you have turned those keys over, and you

9 decide what you do.

10 So that's really my message to you, because I think

11 you could do -- live differently and do better.  But you have

12 to do that.  You have to do the work, and you start with who

13 you spend your time with and what choices you make.

14 So turning to the sentence here, there's just a

15 couple of considerations, in a big-picture way, that bear on

16 what sentence to impose.  On the one hand, the selling

17 firearms is really serious.  It's a bad crime.  I don't need

18 to further detail what Mr. Goldworm has described about it.

19 It's further concerning, and given the findings that I've

20 made, the time period that we're talking about, this, first

21 of all, wasn't even on the shorter time period, it wasn't

22 like a one-day event.  But when you add in the longer period

23 of time, it becomes more substantial, both in numbers and in

24 time period, which is --

25 The second is, there's substantial evidence here

**Add. 45**

1   that's concerning, that, like -- criminal and bad, which is

2   the selling drugs.  And there's -- the evidence here is

3   pretty strong, even though it's not charged, of that.  And

4   that's what we call an aggravating factor.

5            And there's the beating of the inmate.

6            Those are all aggravating factors.

7            Those all make the recommendation that you make,

8   Mr. Goldworm -- I understand why you make it, and they make

9   it reasonable.  It would be reasonable to go to the upper end

10  of the guideline.

11           I've thought a lot about that.  The counterpoint is

12  what you make, Mr. Hanye, which is it's enough.  Like that --

13  it's enough punishment that there's only so much parsing that

14  one can do.  And that, at some point, under 3553(a), you have

15  to say how much is enough for general deterrence, and how

16  much is enough for specific deterrence.  And so -- and that

17  makes 57 a reasonable number, as well.

18           I don't -- I understand why you ask for 46.  It's

19  not -- it's not unreasonable, under the circumstances.  But

20  given the countervailing factors that I've described, and the

21  guideline range, I can't see a below-guideline sentence range

22  in this case.

23           So basically, the biggest reason that I'm going to

24  impose 57, rather than 70, is simply because I think given

25  the -- that both it's a significant sentence and the increase

**Add. 46**

in the sentence over what he's done.  I think he did

12 months on one sentence, and it appears -- and I can't

tell, I didn't write down if it was concurrent or not.  It

looks like he did close to 12 months on something else.  And

it might have been concurrent, and it might have been

separate time.  But either way, he's never been in custody

once for more than 12 months, and neither has he been in

24 months or 22 months.  This sentence is -- it's a big

increase.  And so for those reasons, I am sticking with the

variance.

I will say this, that since I -- you're -- as is

your right -- and no problem -- you might appeal the extra

four points I applied that you objected to, all the factor --

all I'm going to say about that, I guess, two things.  I

can't honestly sit here and say for sure, if I were reversed

and wrong, that I would impose a 57-month sentence.  I'm

not -- I might.  It is certainly possible that I would

upwardly vary, given some of the factors that I identified.

But I can't sit here and say that I didn't think about it

that way, and I can't honestly, just to be perfectly candid

with all of you, say for sure that I would do that.  Which, I

understand what that does, but I just think that's the case.

It's something that I would think about.  I think

it unlikely that I would go below the 46.  And I would think

about these other factors, bearing on whether I should do 46

**Add. 47**

to 57, but I can't say for sure what I would do.  Because it
does change things a little bit when you change the time
period of criminal behavior and the amount of guns.

So I impose three years of --

So pursuant to the Sentencing Reform Act of 1984,
and in light of 3553, you're committed to the custody of the
Bureau of Prisons for a term of 57 months.

You know, neither of you addressed this that
probation raised in the PSR about whether this is -- whether
the effect of my sentence, vis-a-vis the sentences that will
be imposed in these other courts in Lexington County and
Kershaw County.  Those are sentences that haven't been
imposed yet?

THE PROBATION OFFICER:  Your Honor, I'm going to
look right now, but I believe they were sentences that he's
on probation for and violated the probation by committing
this offense.  But let me just look.

THE COURT:  Do either of you have a view?

MR. GOLDWORM:  I have the same general take as
probation, that they were probation violations for this
offense.

THE PROBATION OFFICER:  It's paragraph 54 and 56.
It looks like he -- actually, no, the violation status was
before this offense, on at least -- on both of them.  So he
was in violation status before he was arrested on the instant

**Add. 48**

1  offense.

2         MR. GOLDWORM:  And it's just remained open?

3         THE PROBATION OFFICER:  And it's just remained

4  open, yes.

5         THE COURT:  I don't think what I say -- I mean,

6  he's in the federal custody now.  He's going to serve his

7  sentence.  And when he's done with his sentence, if the state

8  of South Carolina wishes him to -- they either can get him on

9  a detainer, if they wish, or if they don't, they can order

10 him to appear.  And it would be a requirement of supervised

11 release to appear.  And nothing that I say will bind those

12 judges.

13        MR. HANYE:  Agreed.

14        THE COURT:  So nothing further to say to that.

15        Do you want me to make any judicial recommendation

16 to the Bureau of Prisons?

17        MR. HANYE:  No, Your Honor.  No.

18        THE COURT:  All right.  Do you want the

19 recommendation that probation suggested, about vocational

20 training?

21        MR. HANYE:  Yes.

22        THE COURT:  All right.  So include that judicial

23 recommendation.

24        I'm imposing a three-year term of supervised

25 release, and within 72 hours of release, you'll report in

**Add. 49**

1  person to the district to which you're released.

2          I impose no fine, as I find that you don't have the

3  financial ability to pay a fine.

4          Is there forfeiture here?

5          MR. GOLDWORM:  It's the firearms in the indictment,

6  Your Honor.

7          THE COURT:  You don't object to that, do you?

8          MR. HANYE:  No.

9          THE COURT:  I allow the forfeiture to the extent

10  charged in the indictment.

11          Have you reviewed the conditions of supervision

12  that are listed on page 31 and page 32, such that you waive

13  reading of them in their entirety?

14          MR. HANYE:  Yes, Your Honor.

15          THE COURT:  I impose the mandatory conditions, 1,

16  2, 3, and 4, on page 31.

17          The primary one to think about, Mr. Roache, is when

18  you're on supervised release, you can't commit another local,

19  state, or federal crime.

20          I impose the standard conditions the court has

21  adopted from Section 5D1.3(c).  And I'm adding --

22          There are no special conditions recommended by

23  probation.

24          I'm imposing one, which is a -- that I recommend --

25  this is what the condition is:  I recommend that probation

**Add. 50**

1  discuss with Mr. Roache participating in the court's

2  restorative justice program.

3           You do not have to participate, and that will be up

4  to you.  So probation has to discuss it with him.  If you

5  discuss it with probation, you've satisfied the condition.

6           I think you would benefit from meeting with people

7  in a group, not only people who sold guns and possessed guns,

8  but people who have been harmed by drugs and guns.  But

9  that's not a requirement to do it, it's just a requirement to

10 discuss with probation.

11          And then there's the mandatory special assessment

12 of $100.

13          You have the right to appeal from the sentence and

14 the conviction, the determination that I've made, including

15 the one that Mr. Hanye objected to and I overruled, his

16 objection and various aspects of the sentence and the

17 conviction.  Any notice of appeal is due within 14 days of

18 today.

19          If you can't afford to file a notice of appeal with

20 the clerk, you can ask the clerk to prepare and file one on

21 your behalf.

22          You can discuss with Mr. Hanye --

23          There isn't a waiver?  There's no plea agreement

24 here, right?

25          MR. HANYE:  Correct.

**Add. 51**

1          MR. GOLDWORM:  There's no plea.

2          THE COURT:  Anything else from probation?

3          THE PROBATION OFFICER:  No.  Thank you, Your Honor.

4          THE COURT:  Anything else, Mr. Goldworm?

5          MR. GOLDWORM:  Not from the government.

6          THE COURT:  Anything else, Mr. Hanye?

7          MR. HANYE:  Your honor, just for one last time, I'd

8    restate my guidelines objections for the reasons that were

9    argued.

10          And also, for the Court's consideration of that pre

11   2023 behavior under 3553(a), which I heard the Court

12   considered that, as well, the argument being, if there's

13   insufficient evidence to prove that Mr. Roache was connected,

14   then it can't be used against him, within the Court's

15   discretion, either.

16          THE COURT:  Right.  So two things I say:

17          One, all of your rights are preserved as to all of

18   your objections.

19          Two, the reason that I said what I said is I do

20   think, one, if -- if you prevail on the -- if you appeal and

21   prevail on the guideline issue, it is -- changes the

22   guidelines, obviously, and it changes the range.  And the --

23   but it changes the 3553 calculus, I think, to some degree,

24   because part of what I -- I think is relevant to 3553

25   calculus is the duration of time that he was involved in the

1  criminal conduct, and that brings in trafficking firearms in

2  2021; whereas, otherwise, the trafficking firearms is just in

3  2023.

4          And so I think it is a -- I overrule the objection

5  with respect to 3553, given what I found, but I do think that

6  if it goes, it goes -- then I wouldn't be considering

7  trafficking in 2021.  And that's why I say these other

8  factors that were concerning are there, and I might -- as I

9  sit here now, I think I would -- I would not go below the

10 high end of the lower range, given those concerning factors.

11 I would entertain an upward variance.  But I can't sit here

12 and say I would vary upward to the 57 months.  I might.  I'm

13 just not sure.  I would have to think about it and hear from

14 all of you.

15         But all of your rights are preserved.

16         MR. HANYE:  Understood.  Thank you.

17         THE COURT:  We stand in recess.  Thank you.

18         (Court in recess at 12:12 p.m.)

19

20

21

22

23

24

25

**Add. 53**

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4          I, Rachel M. Lopez, Certified Realtime Reporter, in

5     and for the United States District Court for the District of

6     Massachusetts, do hereby certify that pursuant to Section

7     753, Title 28, United States Code, the foregoing pages

8     are a true and correct transcript of the stenographically

9     reported proceedings held in the above-entitled matter and

10    that the transcript page format is in conformance with the

11    regulations of the Judicial Conference of the United States.

12

13                    Dated this 3rd day of April, 2025.

14

15

16

17              /s/ RACHEL M. LOPEZ

18

19

20              _____

21              Rachel M. Lopez, CRR
                Official Court Reporter

22

23

24

25

**Add. 54**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

### District of Massachusetts

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| Aizavier Roache | Case Number:  1:24CR10001-LTS-2 |
| | USM Number:  93578-510 |
| | Joshua Robert Hanye |
| | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)    1

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §§ 933(a)(1), and (3) | Conspiracy to Traffic in Firearms | 8/30/2023 | 1 |

    The defendant is sentenced as provided in pages 2 through ___8___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) ___ ☐ is ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

2/6/2025
Date of Imposition of Judgment

*Leo T Sorokin*
Signature of Judge

Leo T. Sorokin, USDJ
Name and Title of Judge

February 7, 2025
Date

# Add. 55

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page    2    of    8

DEFENDANT:    Aizavier Roache
CASE NUMBER:    1:24CR10001-LTS-2

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a
total term of:
57 Months

☑ The court makes the following recommendations to the Bureau of Prisons:
The Court makes a judicial recommendation that the defendant participate in vocational training in order help prepare
him to enter the workforce upon release from imprisonment.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m. on _____ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**Add. 56**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page ___3___ of ___8___

DEFENDANT:   Aizavier Roache
CASE NUMBER:   1:24CR10001-LTS-2

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

3 years

# MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

# Add. 57

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | Judgment—Page | 4 | of | 8 |

DEFENDANT:  Aizavier Roache
CASE NUMBER:  1:24CR10001-LTS-2

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

# Add. 58

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3B — Supervised Release

Judgment—Page ___5___ of ___8___

DEFENDANT:  Aizavier Roache
CASE NUMBER:  1:24CR10001-LTS-2

## ADDITIONAL SUPERVISED RELEASE TERMS

1.  Probation must discuss Restorative Justice with Mr. Roache. Following this, any participation in Restorative Justice is voluntary.

**Add. 59**

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page   6   of   8

DEFENDANT: Aizavier Roache
CASE NUMBER: 1:24CR10001-LTS-2

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 100.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| TOTALS | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

  ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

  ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

## Add. 60

Judgment — Page  7  of  8

DEFENDANT:  Aizavier Roache
CASE NUMBER:  1:24CR10001-LTS-2

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $ __100.00__ due immediately, balance due

☐ not later than _____ , or
☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
_____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
_____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☑ The defendant shall forfeit the defendant's interest in the following property to the United States:
    1. Glock 21, .45 caliber pistol, bearing serial number AHFP598
    2. Glock 22, .40 caliber pistol, bearing serial number BVKY769

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

# Add. 61

AO 245B (Rev. 09/19)    Case 1:24-cr-10001-LTS    Document 66    Filed 02/07/25    Page 8 of 8
Judgment in a Criminal Case
Sheet 6B — Schedule of Payments

Judgment—Page    8    of    8

DEFENDANT:  Aizavier Roache
CASE NUMBER:  1:24CR10001-LTS-2

### ADDITIONAL FORFEITED PROPERTY

3. Taurus G2C, 9mm pistol, bearing serial number AEC170962
4. Taurus G2C, 9mm pistol, bearing serial number AEC174225
5. Taurus G2C 9mm pistol, bearing serial number AEC174567
6. Taurus G2C 9mm pistol, bearing serial number AEC174190

**Add. 62**